IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No.

BRANDON PRYOR,

     Plaintiff,

v.

SCHOOL DISTRICT NO. 1 d/b/a DENVER PUBLIC SCHOOLS;
SUPERINTENDENT ALEX MARRERO in his Individual and Official Capacities; and
DEPUTY SUPERINTENDENT ANTHONY SMITH in his Individual and Official Capacities

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Brandon Pryor ("Mr. Pryor"), by and through his attorney, Samantha L. Pryor, Esq. of The Halliburton Law Firm, LLC alleges and avers the following:

### NATURE OF THE CASE

1.     Criticism of government and public employees has been a core protected activity under the First Amendment to the United States Constitution since the day the ink dried on the Bill of Rights.

2.     Yet, School District No. 1 d/b/a Denver Public Schools ("DPS"), by and through its officials, retaliated against Mr. Pryor for exercising his free speech rights in advocating against DPS and its employees for blatant discrimination and unlawful practices against Black students, educators, and leaders.

3.      DPS retaliated against Mr. Pryor's free speech by banning Mr. Pryor from being present on any DPS property, including the DPS school Mr. Pryor co-founded; volunteering as a DPS high school football coach; volunteering in any capacity for any DPS school; speaking at DPS Board of Education public comment; and engaging in other activities that are afforded to tax paying citizens with respect to DPS and its public schools and properties.

4.      DPS has also retaliated against Mr. Pryor by publishing false, defamatory information to the media and to DPS parents and students about Mr. Pryor with the intent to damage his reputation.

5.       DPS' unlawful retaliation was clearly designed to silence Mr. Pryor in violation of Mr. Pryor's constitutional rights.

## JURISDICTION AND VENUE

6.      Mr. Pryor brings this action pursuant to 42 U.S.C. §§ 1983, 1985, and 1988 for violation of civil rights under the First Amendment to the United States Constitution.

7.       This Court has subject matter jurisdiction over his matter pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343(a)(3) (civil rights violation), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 1367 (supplemental jurisdiction over state law claims).

8.      This Court has personal jurisdiction over Defendants, who reside in and conduct business in the District of Colorado.

9.      Venue is proper in the District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 because the unlawful practices alleged herein occurred within the District of Colorado.

## JURY DEMAND

10.     Mr. Pryor requests a trial by jury for all counts and issues so triable.

## PARTIES

11.     Plaintiff, Mr. Pryor, is a United States citizen and resident of Denver, Colorado.

12.     Defendant DPS is a public school system located in the City and County of Denver that is funded, in part, by Denver taxpayers and governed by elected officials on the DPS Board of Education (the "BOE").

13.     Defendant Alex Marrero ("Superintendent Marrero") is the Superintendent of DPS. DPS' BOE has issued policies that vest Superintendent Marrero with authority to make all operational decisions on behalf of DPS and to implement DPS' policies and procedures.  At all times relevant, Superintendent Marrero was acting under color of state law and in his capacity as Superintendent of DPS.  Defendant Superintendent Marrero is sued in his official and individual capacities.

14.     Defendant Anthony Smith ("Deputy Smith") is the Deputy Superintendent of DPS. Superintendent Marrero has granted Deputy Smith authority to manage many operational tasks, including operational decisions relating to DPS schools located in Far Northeast Denver ("FNE"). At all times relevant, Deputy Smith was acting under color of state law and in his capacity as Deputy Superintendent of DPS.  Deputy Smith is being sued in his official and individual capacities.

## STATEMENT OF FACTS

**A.  Mr. Pryor's History of Advocacy**

15.     For the past five years, Mr. Pryor has been a passionate, powerful voice in the community who has advocated against DPS' systemic discrimination and oppression over Black students, educators, and community.  Mr. Pryor has utilized his personal Facebook page as a platform to inform community about the happenings in DPS and to vigorously advocate for education justice within DPS.

16.     Mr. Pryor has also passionately advocated for change during DPS BOE meetings.

17.     Over the years, Mr. Pryor has attracted a significant following of supporters, and his advocacy has been extremely effective in impacting positive change for students and schools within DPS.

18.     Mr. Pryor started his advocacy in 2017, when he began coaching on the FNE Warriors Football team, the only regional program in the country[1].  In 2018, Mr. Pryor co-founded Warriors for High Quality Schools, a Colorado Nonprofit Corporation, to further efforts in advocating for education justice, particularly in FNE Denver.

19.     In 2019, Warriors for High Quality Schools prepared an application to form a school specifically designed to educate Black students in light of DPS' documented failures and

---

[1] The regional program was formed as a direct result of DPS' oppressive acts in closing Montbello High School, the heart of the Montbello community, and replacing the school with eleven different high schools in the FNE area.

outright discrimination[2] toward Black students.  Mr. Pryor and his co-founders patterned the school after Historically Black Colleges and Universities ("HBCU") so that Black students in DPS can learn about their rich history, have a pride for who they are as Black individuals, and gain a top-quality education that will lead to STEAM fields.  Like HBCUs, the new high school is also open to and benefits students of all colors and races.

20.     While pursing the new school application, Mr. Pryor and Warriors for High Quality Schools continued advocating for DPS to reopen Montbello High School ("MHS").  Because DPS was initially dismissive of any efforts to reopen MHS, Mr. Pryor continued his advocacy and used his voice to convince DPS leadership to make significant upgrades to the MHS building and campus, including, but not limited to, (1) a library inside of the MHS, which was being used as a classroom for five different schools located in the MHS building; (2) a brand new, state of the art weight room; (3) new turf, stadium lights, bleachers, and concrete foundation for MHS' athletic fields; and (4) other meaningful improvements to level the playing field for DPS students in FNE Denver.

21.     Meanwhile, Mr. Pryor continued coaching football for FNE Warriors.  Mr. Pryor and the team of coaches rebuilt the FNE Warriors football team after the FNE Warriors' previous coach abandoned the team mid-season to coach at a different school[3].  Ultimately, the FNE Warriors won a 5A State Championship in 2020.

---

[2] For example, evidence collected in 2018 indicated the achievement gap between Black students and White students within DPS was the third largest achievement gap in the United States. There is evidence to suggest that the achievement gap has only grown larger in 2022, and DPS has refused to reveal the true data.

[3] Mr. Pryor raised concerns on Facebook about DPS allowing coaches to work at FNE schools while coaching at other schools across the state.

22.     Mr. Pryor also co-founded Warrior Nation, a Colorado Nonprofit Corporation and youth sports organization, which was designed to be a feeder program into the FNE Warriors program.  No other school in DPS has developed feeder programs at the youth level for its high schools.   Yet, Mr. Pryor and his co-founder garnered the support and major buy-in from community members across the Denver metropolitan area.

**B.  DPS Approves the Robert F. Smith STEAM Academy**

23.     Despite Mr. Pryor's vehement advocacy toward DPS, DPS employees, and members of the DPS BOE, the DPS BOE unanimously approved the application for the HBCU-style high school in 2019.  The HBCU-style school was eventually named the Robert F. Smith STEAM Academy (the "STEAM Academy").

24.     In approving the STEAM Academy, the DPS BOE issued a resolution for facility placement and concluded that the STEAM Academy would be co-located with Montbello Career and Technical School ("MCT") in an office building located in the FNE.  The BOE resolution promised that the facility would be a temporary location for up to two years, and that DPS would continue searching for a long-term facility.

25.     Despite approving the STEAM Academy, DPS and its employees began engaging various actions and omissions that caused significant issues with the progress, enrollment, and success of the STEAM Academy.

26.     The STEAM Academy was scheduled to open its doors to DPS students in the fall of August 2021, and the DPS School Choice and Enrollment ("Choice") process began in February 2021.

27.     The Warriors for High Quality Schools' team worked tirelessly to promote the STEAM Academy in an effort to reach its projected enrollment goals of between 100 and 125 students.  The initial round of Choice was critical for the inaugural year of the STEAM Academy.

28.     However, unfortunately, DPS' Choice department recklessly misidentified the STEAM Academy's address on the Choice form. Instead of identifying the office building in which DPS placed the STEAM Academy, DPS' Choice team assigned DPS headquarters, 1860 Lincoln, as the STEAM Academy's address.  Consequently, when parents entered their addresses into the Choice system, the STEAM Academy did not show as an option for their students to enroll. Notably, DPS' Choice Department had correctly identified the address for all of the other newly approved schools during the critical first round of Choice.

29.     When Mr. Pryor learned of DPS' egregious misstep, he immediately contacted DPS and raised complaints and concerns.  Mr. Pryor participated in a Zoom meeting with the Liz Mendez ("Ms. Mendez"), who led the Choice department.  During the Zoom meeting, Mr. Pryor criticized Ms. Mendez and her team for making such an obvious error, which seemed intentional given the correct identification of addresses for other new schools.

30.     Remarkably, DPS employees in the Choice department then began calling parents who enrolled their students into the STEAM Academy, asking them if they really wanted their children to attend the STEAM Academy.  Parents began calling Mr. Pryor, informing him that DPS employees were seemingly trying to convince them that they made the wrong decision by enrolling their children to attend the STEAM Academy.

31.     Mr. Pryor went live on Facebook to mitigate DPS' continued efforts to interfere with the Choice process and enrollment at the STEAM Academy.  Mr. Pryor informed community

members of DPS' actions, and he encouraged the community to contact him if they continued experiencing issues with enrolling their students at the STEAM Academy.  Mr. Pryor also continued to press the line with DPS, and as a remedy for DPS' harmful actions, DPS ultimately agreed to fund the STEAM Academy based on its projected enrollment of 125 students per year for the next four years.

### C. DPS Reopens MHS and Black Educators and Leaders Are Terminated

32.     Ironically, shortly after DPS approved the application to open the STEAM Academy in 2019, DPS suddenly announced a decision to reopen MHS.  DPS hired Neisa Lynch ("Ms. Lynch") as the new principal to lead MHS.

33.     Remarkably, Ms. Lynch fired the coaching staff for the FNE Warriors, even after Mr. Pryor and the FNE coaching staff advocated for well over five years to reopen MHS and to improve the MHS building.  Ms. Lynch also terminated the employment of many valuable and talented Black educators.

34.     DPS, Superintendent Marrero, and Deputy Smith (collectively, "Defendants") also terminated the employment of various other Black leaders throughout DPS who have advocated and established successful programming for Black students.

35.     Just as he had done for the previous six years, Mr. Pryor utilized his platform on Facebook to bring awareness to the community about DPS' decisions around the reopening of MHS and the mass termination of Black educators.  Mr. Pryor also informed the community about Ms. Lynch's decisions to terminate the FNE coaching staff and other Black educators and leaders.

**D.  DPS Fails to Take Action When Football Games Were Stolen from Students**

36.     In Summer 2021, DPS announced that the FNE regional football team would be dissolved and that players from the FNE regional team could immediately begin playing football for MHS or any other school within DPS.

37.     Mr. Pryor recognized the harm DPS' hasty decision-making causes to community, and he began advocating against DPS' decision to shut down the FNE Warriors regional team. Ultimately, Mr. Pryor and others convinced DPS to maintain the FNE Warriors program until 2024 and allow MHS to establish a freshman football team, the MHS Warriors.  MHS, the STEAM Academy, and other FNE schools had two years to establish sports programs for their respective schools.

38.     On or about August 27, 2022, Mr. Pryor utilized his platform on Facebook to inform community about a game that was stolen from the FNE Warriors' Junior Varsity ("JV") football team.  Mr. Pryor explained that the FNE Warriors' JV team appeared for a pre-scheduled game against Westminster High School ("Westminster"), and Westminster did not show up for the game.

39.     It was later discovered that Westminster's athletic director was confused by the two Warriors programs and erroneously contacted someone at MHS to inquire about the JV game against Westminster.  MHS staff refused to reroute the call to FNE Warriors.  Instead, MHS staff arranged for Westminster's JV team to play the MHS Warriors' Freshman team instead of the pre-scheduled game against FNE Warriors.

40.     Community was outraged.  DPS was fully aware of this incident, yet it failed to take any corrective action against Ms. Lynch or anyone at MHS.

41.     Notably, Deputy Smith is friends with Ms. Lynch and the new staff at MHS, including the MHS Athletic Director, Damian Brown ("Mr. Brown").  Mr. Brown was initially the athletic director for FNE Warriors.  However, he left FNE and began working in a different school district.  Ms. Lynch hired Mr. Brown when MHS was reopened.  Before Ms. Lynch terminated the FNE coaching staff, Mr. Brown created the FNE Warriors' schedule without any input from the FNE coaching staff.  After DPS decided the FNE team would be maintained, Mr. Brown did not create a schedule for the MHS Warriors' freshman team.

42.     Deputy Smith is close friends with Ms. Lynch and Mr. Brown.

43.     Mr. Pryor raised concerns on Facebook about cronyism and the lack of accountability for Ms. Lynch, Mr. Brown, and any other MHS staff for the JV game that was stolen.  To date, no action has been taken against any MHS staff member for the incident.

44.     Mr. Pryor continued using Facebook to inform community about, and to advocate against, Ms. Lynch's decisions and actions and the lack of accountability due to cronyism.  Mr. Pryor specifically made Facebook posts about Deputy Smith as well as Ms. Lynch's husband, who is also a public employee who works for Westminster Public Schools.

**E.  DPS Fails to Provide Adequate Facilities and Hot Lunches to STEAM Academy**

45.     Since August 2022, Mr. Pryor was present nearly every day at the STEAM Academy, building relationships with staff and students, ensuring students were safe and in class, and ensuring the students' needs were met.

46.     Soon, Mr. Pryor began noticing significant issues with the office building and its impact on the students' learning.  While the office building is nice, it is simply not a school building. Students are crammed into small offices and spaces that were never designed to be

classrooms.  The office building has very narrow hallways and does not have a kitchen to feed the students a hot lunch.

47.     Mr. Pryor began raising concerns with Deputy Smith and requested Deputy Smith's assistance in securing a more permanent facility.  Deputy Smith responded to Mr. Pryor's concerns by outlining a number of criteria that the STEAM Academy was allegedly supposed to satisfy before DPS could commit to a new facility for the STEAM Academy.

48.     Knowing that Deputy Smith was friends with the new hires at MHS and that DPS did not require any of those same criteria for other schools with majority White students, Mr. Pryor began advocating for the needs of the minority students at the STEAM Academy.  The conversation became heated.

49.      Remarkably, Deputy Smith threatened Mr. Pryor and stated that Mr. Pryor could have either "an adversary or an advocate".  Deputy Smith indicated that he could either make it easy or hard for Mr. Pryor to obtain the necessary facilities for the STEAM Academy.

50.     Around the same time, Superintendent Marrero made a public comment that the "DPS Blacks" were happy with him.

51.     On September 16, 2022, Mr. Pryor began speaking out on Facebook about Deputy Smith, Superintendent Marrero, and how cronyism was negatively impacting students.

52.     Mr. Pryor sharply criticized Superintendent Marrero, Deputy Smith, Ms. Lynch and other public employees.  Mr. Pryor also informed community about DPS' blatant discrimination against Black students and educators under Superintendent Marrero's leadership, including, but not limited to, DPS' actions in:

a. filing a trademark for the Know Justice Know Peace podcast, a creative, constitutionally protected work created by Black female students;

b. placing a disproportionate number of Black male students in Affective Needs centers without justification or testing;

c. failing to provide adequate school facilities, including a library, kitchen, and adequate classroom space, for the STEAM Academy;

d. failing to provide hot, healthy lunches to students at the STEAM Academy;

e. creating barriers for the STEAM Academy to obtain a suitable facility by establishing false requirements such as performance and enrollment while spending $40,000,000.00 to fund more affluent school communities without those same requirements;

f. interfering with the STEAM Academy's enrollment by placing students on the wait list;

g. threatening to close MCT because DPS failed to keep its promises in finding a long-term solution for the STEAM Academy's facility placement; and

h. many other instances in which DPS has unlawfully discriminated against Black students and educators.

53. On September 19, 2022, Mr. Pryor attended DPS' BOE public comment session and spoke out against DPS' discriminatory treatment of the students at STEAM Academy.

54. Mr. Pryor also appeared in the news media highlighting DPS' failures, including DPS' justifications for serving lukewarm lunches to the STEAM Academy.

55. After a BOE work session at DPS headquarters on October 12, 2022, Mr. Pryor addressed his concerns with DPS Staff about the lack of adequate facilities and meals for the

STEAM Academy.  Mr. Pryor was passionate in his delivery and denounced DPS staff for failing to provide adequate facilities to DPS students at the STEAM Academy.

56.     On October 17, 2022, Mr. Pryor and a large group of activists, students, parents, and educators appeared at DPS headquarters for public comment.  During their comments, the large group raised concerns about feeling discriminated against, not having the proper facility or daily meals to grow and thrive, and other important issues relating to the students' education and school environment at the STEAM Academy.

## UNLAWFUL RETALIATION

57.     The very next day, on October 18, 2022, DPS retaliated against Mr. Pryor by paying two armed DPS security officers to serve a letter on Mr. Pryor at his personal residence.  In the letter dated October 18, 2022, DPS unlawfully banned Mr. Pryor from coaching, participating in DPS as a volunteer, appearing at DPS for public comment, and being present on any DPS property, except during "public events" and to participate in his children's education (the "Ban Letter").

58.     In addition, Superintendent Marrero sent a tone-def email to the DPS community in direct response to the previous day's public comments.  Superintendent Marrero was clearly bothered by the advocacy during public comment, and his defensive email only sparked more outrage amongst community members.

59.     In its Ban Letter, DPS claims Mr. Pryor has demonstrated an alleged pattern of behavior that DPS deemed bullying, intimidating, and harassing.  The Ban Letter was accompanied by a thumb drive with purported supporting materials.  In the Ban Letter and materials, DPS reached far back into history in shameful attempt to justify Defendants' unconstitutional actions in banning Mr. Pryor from DPS.

60.     However, none of the evidence in the Ban Letter demonstrates any bullying, intimidating, or harassing behavior towards any DPS employees. DPS' alleged reasons are merely pretext for unlawful discrimination and retaliation in an attempt to silence Mr. Pryor.

**A.  DPS Policies KFA, KI, G, and AC**

61.     In its Ban Letter, DPS claims Mr. Pryor violated DPS policies, including Administrative Policies KFA, KI, G, and AC.  However, none of those policies apply in this case, and there is no evidence to even suggest that Mr. Pryor violated any of those policies.

62.     Policy KFA prohibits certain public conduct on DPS school property.  However, DPS has not even alleged that Mr. Pryor engaged in any conduct while on school property.  Rather, the Ban Letter identifies Mr. Pryor's speech that either occurred on Facebook or during Zoom conferences.  Moreover, even if Policy KFA did apply, which it does not, Mr. Pryor has not engaged in any conduct that violates the policy, and DPS has not provided any such evidence.

63.     Like Policy KFA, Policy KI applies to conduct on school property and governs Visitors to Schools.  Policy KI outlines limitations as to who may visit schools and the check-in requirements for visitors.  Policy KI does not apply to any fact or issue set forth in the Ban Letter, and there is no indication that Mr. Pryor somehow violated Policy KI.

64.     Next DPS claims it banned Mr. Pryor because he somehow violated Policy G, which is DPS' Employment Handbook.  Yet, as DPS recognizes, Mr. Pryor is not a DPS employee.  Nothing about the Employment Handbook governs Mr. Pryor or his conduct.

65.     Policy AC governs discrimination.  There is no evidence that Mr. Pryor somehow violated DPS Policy AC.  To the contrary, DPS was violating its own Policy AC, and Mr. Pryor

was raising awareness and concern around DPS' blatant discrimination against Black and Latinx students and educators.

**B.  DPS' Retaliatory Investigations**

66.     The Ban Letter also revealed that, unbeknownst to Mr. Pryor, DPS had conducted several investigations since 2020 in response to Mr. Pryor's advocacy.  Other than one investigation concerning a DPS Regional Instructional Superintendent, DPS never informed Mr. Pryor of any complaint or investigation brought against him until DPS issued the Ban Letter on October 18, 2022.

67.     Nor did DPS inform Mr. Pryor about any results from the investigations.  Nevertheless, DPS banned Mr. Pryor from all DPS property and programs without giving Mr. Pryor notice and an opportunity to be heard in violation of Mr. Pryor's due process rights.

68.     Nothing about Mr. Pryor's Facebook posts constitute harassing, bullying, threatening, or intimidating behavior as DPS claims in its Ban Letter.  Instead, the Facebook posts illustrate Mr. Pryor's advocacy and efforts to inform community about DPS, DPS employees, and DPS BOE members, just as Mr. Pryor had done for the past five years.

69.     Indeed, Mr. Pryor is a taxpaying homeowner who resides in the City and County of Denver.  Mr. Pryor has a constitutionally protected right to use his Facebook page and attend BOE meetings to criticize DPS and its public employees, even if the criticism was sharp or included curse words.

**C.  DPS' False Statements and Purported Supporting Materials**

70.     DPS' Ban Letter and purported supporting materials contain false and defamatory information and inferences.  DPS has not only banned Mr. Pryor based on these false statements,

DPS caused additional harm to Mr. Pryor by publishing false information to media outlets and to families at STEAM Academy.

i.     Mr. Pryor Does Not Have Any Felony Convictions

71.     In a shameful attempt to ban Mr. Pryor from coaching, DPS falsely states that Mr. Pryor has "felony convictions in Texas".  DPS' statements are false and defamatory.  Mr. Pryor had a deferred judgment, which resulted in no convictions.  Mr. Pryor does not have any felony conviction in his history, let alone multiple felony convictions in Texas.

72.     Importantly, DPS previously attempted to prevent Mr. Pryor from coaching based on a 2014 assault charge.  However, that charge arose from an incident wherein the alleged victim, a White male, called Mr. Pryor a nigger and spit in his face.  In response, Mr. Pryor punched the alleged victim in the face, and the alleged victim filed charges.

73.     Mr. Pryor advocated for himself and other Black and Latinx men in the community with criminal charges to be allowed to coach.  DPS agreed that Mr. Pryor should be allowed to coach and teach youth about making mistakes by sharing his story.  DPS changed its policy to consider volunteers' history on a case-by-case basis.  Mr. Pryor has cleared the background checks and has been coaching every school year since 2018.

74.     Now, suddenly because DPS' "new leadership", Superintendent Marrero and Deputy Smith, are annoyed, bothered, and/or uncomfortable with Mr. Pryor's continued advocacy, Defendants abruptly decided that Mr. Pryor is somehow ineligible for further volunteering or coaching opportunities with DPS.  Defendants' actions are clearly in retaliation for Mr. Pryor engaging in constitutionally protected speech.

ii.     Screenshot of Mr. Pryor's Conversation with Community Member

75.     In the Ban Letter, DPS claims Mr. Pryor allegedly sent threatening messages to "DPS employees."  Apparently in an attempt to support that claim, DPS included a screen shot of a message Mr. Pryor exchanged with a community member—not a DPS employee.   The community member is a White male who also sharply criticizes DPS and members of DPS BOE. In fact, the community member has stated that BOE Vice President, Auontai Anderson (a Black man), should "kill himself" and that he should be castrated.  DPS did not ban the community member (a White man) for making those comments about a member of DPS' BOE.

76.     In addition to issuing the Ban Letter, DPS sent a cryptic, defamatory email to the parents and students at the STEAM Academy, insinuating that Mr. Pryor was somehow not creating a safe and welcoming environment for students at the STEAM Academy.   DPS' defamatory email informed the STEAM Academy stakeholders that Mr. Pryor would not be allowed to access the STEAM Academy building as a school founder.

**FIRST CLAIM FOR RELIEF**
**Retaliation in Violation of First Amendment,**
**as applied to the states under the Fourteenth Amendment**
**(Against Superintendent Marrero and Deputy Smith in their Official and Individual**
**Capacities Under 42 U.S.C. §§ 1983 and 1985)**

77.     Mr. Pryor incorporates by reference the allegations in paragraphs 1 through 76 above as if fully set forth herein.

78.     Defendants Superintendent Marrero and Deputy Smith are responsible for implementing DPS' policies and procedures, and they have deliberately conspired to enforce those policies in a manner that deprived, and continues to deprive, Mr. Pryor of his free speech rights under the First Amendment to the United States Constitution.

79.     Defendants Superintendent Marrero and Deputy Smith violated, and are continuing to violate, Mr. Pryor's right to free speech and expression, especially his political expression, as guaranteed by the First Amendment and the Fourteenth Amendment to the United States Constitution.

80.     Defendants Superintendent Marrero's and Deputy Smith's actions are, in whole or in part, unlawfully motivated by their disagreement with Mr. Pryor's constitutionally protected speech.

81.     In intentionally depriving Mr. Pryor of his rights, Defendants Superintendent Marrero and Deputy Smith acted under color of state law, and such deprivation is actionable under 42 U.S.C. §§ 1983 and 1985.

<u>**SECOND CLAIM FOR RELIEF**</u>
**Failure to Adequately Train and Supervise Under 42 U.S.C. § 1983**
**(Against DPS)**

82.     Mr. Pryor incorporates by reference the allegations set forth in paragraphs 1 through 81 above as if fully set forth herein.

83.     DPS' BOE has enacted policies and procedures that have allowed Superintendent Marrero and Deputy Smith to issue the Ban Letter in retaliation of Mr. Pryor's constitutional rights.

84.     DPS and its BOE have consciously failed to adequately train and supervise Superintendent Marrero and Deputy Smith in implementing DPS policies and procedures so that constitutional violations do not occur.

85.     DPS and its BOE have actual and constructive notice that their failure to adequately train and supervise Superintendent Marrero and Deputy Smith are substantially certain to result in

18

a constitutional violation, and DPS and its BOE have consciously and deliberately chose to disregard that risk of harm.

86.     Defendants deprived, and are continuing to deprive, Mr. Pryor of the rights secured to Mr. Pryor by the First Amendment to the United States Constitution.

87.     Defendants violated, and are continuing to violate, Mr. Pryor's right to free speech and expression, especially his political expression, as guaranteed by the First Amendment and the Fourteenth Amendment to the United States Constitution by engaging in the acts and omissions described hereinabove.

88.     Defendants' actions are, in whole or in part, unlawfully motivated by Defendants' disagreement with Mr. Pryor's constitutionally protected speech.

89.     DPS' policies, practices, and customs are the moving force behind the constitutional deprivation described herein.

**THIRD CLAIM FOR RELIEF**
**Violation of Article II, Section 10 of Colorado State Constitution**
**(Against All Defendants)**

90.     Mr. Pryor incorporates by reference the allegations set forth in paragraphs 1 through 89 above as if fully set forth herein.

91.     Defendants deprived, and are continuing to deprive, Mr. Pryor of the rights secured to him by the Colorado Constitution.

92.     Defendants' conduct described in paragraphs 1 through 91 violated, and continues to violate, Mr. Pryor's right to freedom of speech under Article II, Section 10 of the Colorado Constitution.

## PRAYER FOR RELEIF

**WHEREFORE**, Mr. Pryor respectfully requests the following relief:

a. An order declaring that the Defendants violated Mr. Pryor's rights protected under the First Amendment of the United States Constitution, and the Colorado State Constitution;

b. An order declaring that the Defendants engaged in unlawful viewpoint discrimination in violation of the First Amendment of the United States Constitution, and the Colorado state Constitution.

c. An order preliminarily and then permanently enjoining Defendants and DPS employees and all other persons or entities in active concert or privity or participation with them, from restraining, prohibiting, or suppressing Mr. Pryor or any other person within Denver Public Schools from exercising free speech;

d. An order directing Defendants to take such affirmative steps necessary to remediate the past restraints to Mr. Pryor's expression through his advocacy;

e. An order enjoining Defendants and their officers, agents, affiliates, subsidiaries, servants, employees and all other persons or entities in active concert or privity or participation with them, from taking further retaliatory action against Mr. Pryor, his children, STEAM, or anyone else involved for bringing this lawsuit or for advocating for free speech rights;

f. An entry of judgment for Mr. Pryor for compensatory and other appropriate damages against Defendants;

g. An award to Mr. Pryor and against Defendants for Mr. Pryor's reasonable attorney's fees and costs incurred in connection with this action pursuant to 42 U.S.C. § 1988.

h. Retain jurisdiction of this matter to enforce the terms of the Court's orders; and

i.    An order granting such further and different relief as this Court may deem just and proper or that is necessary to make Mr. Pryor whole.

Dated:  November 3, 2022.

Respectfully Submitted,

**ATTORNEY FOR PLAINTIFF**

*/s/Samantha L. Pryor*
Samantha L. Pryor, Esq. #39194
THE HALLIBURTON LAW FIRM, LLC
8354 Northfield Blvd. Suite 3700
Denver, CO 80238
303-803-1060
spryor@thehalliburtonlawfirm.com