IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:22-cv-02886

BRANDON PRYOR,

    Plaintiff,

v.

SCHOOL DISTRICT NO. 1 d/b/a DENVER PUBLIC SCHOOLS;
SUPERINTENDENT ALEX MARRERO in his Individual and Official Capacities; and
DEPUTY SUPERINTENDENT ANTHONY SMITH in his Individual and Official
Capacities

    Defendants.

---

## REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

---

Plaintiff Brandon Pryor ("Mr. Pryor"), by and through his attorney, Samantha L. Pryor, Esq. of The Halliburton Law Firm, LLC, hereby submits his **REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** as follows:

### <u>INTRODUCTION</u>

This case is about blatant retaliation against Mr. Pryor for engaging in his free speech rights under the First Amendment to the United States Constitution. Denver Public Schools ("DPS") has a long, deep, and admitted history of systemic discrimination and racism against Black students, educators, and leaders. Mr. Pryor's advocacy and work centers on dismantling DPS' system of oppression and the resulting school to prison pipeline. DPS has repeatedly declared its intent to dismantle such oppressive systems, including in DPS' most recent strategic plan. Yet, it appears DPS has doubled down on its discriminatory tactics and continues to perpetuate its unlawful system of oppression.

After Mr. Pryor publicly criticized DPS' new leadership on matters of public concern, DPS and its employees swiftly retaliated against Mr. Pryor.

Mr. Pryor initiated this action on November 3, 2022 with the filing of his Complaint and Jury Demand (the "Complaint") against DPS, Superintendent Alex Marrero ("Superintendent Marrero") and Deputy Superintendent Anthony Smith ("Deputy Smith") (collectively, "Defendants").   On November 4, 2022, Mr. Pryor filed a Motion for Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65(a) (the "Motion") [Doc. No. 4].   Defendants filed their Response to Plaintiff's Motion for Preliminary Injunction (the "Response") on November 17, 2022 [Doc. No. 14.].

Nothing about Defendants' Response alters the propriety of this Court granting the relief requested in Mr. Pryor's Motion. None of the arguments or issues raised in Defendants' Response justify the issuance of the Ban Letter.

At the outset, Defendants attempt to criminalize Mr. Pryor just as DPS has done to many Black students, educators, and leaders.  The Ban Letter even indicates Mr. Pryor's mere "presence" and "demeanor" are intimidating, which is overtly racist and discriminatory.  Other than making repeated conclusory arguments, Defendants have failed to identify any facts or law establishing Mr. Pryor's conduct was within one of the established categories of unfavored speech. Mr. Pryor has not engaged in any conduct with the intent to bully, intimidate, threaten, or harass any DPS employee.  Defendants simply do not like that Mr. Pryor vehemently advocates against Defendants' unlawful actions against Black and Latinx students, educators, and leaders. However, children are dying at rapid rates due to gun violence, and time is of the essence in allowing people

like Mr. Pryor to advocate for lasting change and to create spaces for children to thrive. Defendants' alleged justifications are only pretext for retaliation and discrimination.

Contrary to Defendants' arguments, the Ban Letter is not a reasonable restriction. The Ban Letter itself references a "complete and total ban", which is not narrowly tailored to serve any substantial state interest.  There is simply no rational relationship between any of Mr. Pryor's activities and the "complete and total ban" from DPS as set forth in the Ban Letter.  The Ban Letter is severely overreaching and overbroad and is not narrowly tailored to address any concern of a legitimate threat.

Moreover, Defendants have failed to abide by their own policy regarding banning people from schools.  Defendants' sledgehammer approach is not consistent with DPS' Regulation KFA-R or First Amendment jurisprudence.  Indeed, Defendants never attempted any conflict resolution with Mr. Pryor before it issued the Ban Letter.

Furthermore, the Pickering Test does not apply in this case.  Although Defendants admit Mr. Pryor is not a DPS employee, Defendants' entire case rises and falls on arguments that apply only to public employees.  The Tenth Circuit Court of Appeals expressly rejected the Pickering test in cases involving non-employees to reduce the risk of infringement on protected speech.  Ultimately, Mr. Pryor can satisfy the elements of any applicable test, especially because, inter alia, Defendants' "complete and total ban" is not narrowly tailored to serve any legitimate interests.

Defendants claim the restrictions were placed on Mr. Pryor after DPS received a series of complaints concerning unprofessional, inappropriate, and harassing conduct from multiple DPS employees.  However, Defendants did not issue the "complete and total" ban on Mr. Pryor until after he publicly criticized Superintendent Marrero, Deputy

Smith, and Deputy Smith's friends.   For example, DPS even invited Mr. Pryor to participate in interviewing and selecting DPS' Executive Director of Equity and Culture in April 2019, which contradicts Defendants' arguments that Mr. Pryor is somehow a disruption to operations.   Even if Defendants could muster up an allegedly legitimately reason for issuing a "complete and total ban", Defendants cannot lawfully impose such restrictions that are issued in retaliation for engaging in First Amendment free speech rights. That is precisely what occurred in this case.

Finally, Defendants claim that, because they removed the public comment ban, Mr. Pryor cannot show irreparable injury.   Defendants argue "Mr. Pryor remains unrestricted in his ability to speak out on any current issue or dispute involving DPS in any other location including the media and Facebook."  [Response, pp. 23-24.]

Defendants' arguments are belied by the express language of the Ban Letter.  The remaining restrictions are much broader than Defendants claim. Defendants' Ban Letter relies almost exclusively on Mr. Pryor's Facebook activity as the reason for issuing the Ban Letter in the first instance.  Defendants' actions have demonstrated that they can and will retaliate against community members who dare to exercise their free speech on Facebook or in any other context.  Defendants' goal was to silence, and make an example out of, Mr. Pryor, a community advocate with one of the most powerful voices of change in recent history.

## RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

In their Response, Defendants recognize that Mr. Pryor is a founder of a DPS high school, a volunteer football coach, and the parent of two DPS students.   However, Defendants fail to acknowledge that Mr. Pryor is also a community activist who has been

advocating for education justice since 2017. [*See* Exhibit 1, Facebook posts, generally.] Mr. Pryor gained a significant following of taxpaying citizens. Defendants' true fear is being exposed, especially given Mr. Pryor's influence and reach.

**A. Policies of Denver Public Schools**

1. Mr. Pryor agrees that the DPS BOE is the governing body of DPS.

2. Mr. Pryor agrees that DPS BOE appoints the Superintendent who serves as the Chief Executive Officer of DPS.

3. Mr. Pryor agrees that the DPS BOE has adopted a variety of policies governing the operations of DPS.  Mr. Pryor further states that the BOE has set a "policy governance model", which delegates power to Superintendent Marrero to make any and all operational decisions for DPS.  [*See, e.g.*, Exhibit 2, DPS Governance Policies, Handling Operational Issues Raised by a Community or Staff Member.]

4. DPS' Policy AC addresses Nondiscrimination/Equal Opportunity.  Unfortunately, Defendants have violated this policy in numerous ways, including, but not limited to, the following:  (a) filing a trademark for the Know Justice Know Peace podcast, a creative, constitutionally protected work created by Black female students; (b) placing a disproportionate number of Black male students in Affective Needs centers without justification or testing; (c) failing to provide adequate school facilities, including a library, kitchen, and adequate classroom space for the STEAM Academy, which is comprised of nearly 99% minority students; (d) failing to provide hot, healthy lunches to students at the STEAM Academy; (e) creating barriers for the STEAM Academy to obtain a suitable facility by establishing false requirements such as performance and enrollment while spending $40,000,000.00 to fund more affluent school communities without those same

requirements; (f) interfering with the STEAM Academy's enrollment by placing students on a waitlist; (g) threatening to close schools because DPS failed to uphold its ethical and legal obligations in finding a long-term solution for the STEAM Academy's facility placement; and (h) many other instances in which DPS has unlawfully discriminated against Black students and educators. Mr. Pryor's advocacy has been directed at Defendants failure to abide by their own policies and alleged core values.

5. Mr. Pryor agrees that Regulation AC-R1 establishes the procedures for investigating complaints of discrimination and harassment.  The regulation also defines "Harassment".  [See Exhibit 51, Regulation AC-R1.]

6. Mr. Pryor agrees that Policy GBGB sets forth a policy regarding Personal Safety and Security.  However, Policy GBG does not apply to this case.  Rather, Policy GBGB expressly "appl[ies] to allegations of assault, disorderly conduct, harassment, a knowingly false allegation of child abuse, or an alleged criminal offense **by a student against a teacher or school employee.**"  [Exhibit 52, Policy GBGB, Personal Safety and Security, p. 1 (alteration and emphases added).]

7. Mr. Pryor agrees that Policy KFA concerns Public Conduct on School Property. However, Policy KFA does not apply in this case because the Ban Letter does not allege that Mr. Pryor engaged in any conduct while on school property.  Defendants did not cite any incidents that occurred on school property until after this lawsuit was filed.  [*See* ¶14.]

8. Mr. Pryor agrees that DPS Regulation KFA-R was developed for the implementation of DPS Policy KFA.  However, Policy KFA does not apply to the Ban Letter issued in this case.  Even if it does apply, Defendants failed to abide by this policy, which states that, "***[u]nder no circumstances should letters of restriction to schools***

*be used in place of conflict resolution or to retaliate against a parent/legal guardian*." [Exhibit 54, Regulation KFA-R, p. 1 (alteration and emphases added) (identifying mediation as one of the options for conflict resolution).] Defendants have never attempted any conflict resolution efforts with Mr. Pryor before issuing the "complete and total ban."

9.  Mr. Pryor agrees that Policy K applies to conduct on school property and governs visitors to schools. Policy K does not apply to any fact or issue set forth in the Ban Letter, and there is no indication that Mr. Pryor somehow violated Policy K. In fact, Defendants retaliated against Mr. Pryor by sending a defamatory, cryptic email[1] to STEAM Academy parents and stakeholders, insinuating that Mr. Pryor somehow created a danger to students and is not allowed on the STEAM Academy's property. [See Exhibit 3, DPS Email to STEAM Academy community dated 10.20.2022.]

**B. Mr. Pryor's Relationship to DPS:**

10.  Mr. Pryor agrees that he is one of three founders of Warriors for High Quality Schools, which founded the STEAM Academy, an HBCU-style high school. The STEAM Academy is a DPS Innovation School pursuant to C.R.S. § 22-32.5-102 *et seq*.

11. Mr. Pryor was a volunteer football coach for the FNE Warriors Regional Athletics program since 2017 until DPS issued the retaliatory Ban Letter.

12. Mr. Pryor agrees that he is a parent of two DPS students.

13. Mr. Pryor agrees that he is not a DPS employee.

---

[1] Unlike any other correspondence from Defendants to community, the email was sent from a generic email account, messenger@dpsk12.org, and the email was not signed by any DPS employee. [*Cf* Exhibit 3, DPS Email dated 10.20.2022 and Exhibit 4, DPS Community Update 10.18.2022.]

**C. History of Mr. Pryor's Conduct and Restrictions on his Access to District Property**

14. On or about January 1, 2019, Mr. Pryor received a call from Florida Pitt Waller K-8 School ("FPW") regarding an incident with his then seven-year-old son.  Mr. Pryor had previously made several complaints to then principal Kayla Grayson regarding constant and repeated bullying of his son and how it was impacting his son's learning and social and emotional development.  However, neither FPW nor DPS took any meaningful action to address Mr. Pryor's concern.  As a result, the bullying continued and even worsened.  Three months later, on April 19, 2019, Mr. Pryor's then seven-year-old son was handcuffed while at school.   Mr. Pryor advocated to ban the use of physical and mechanical holds in elementary schools and entered into a Confidential Settlement Agreement with DPS as a result of the handcuffing incident.

    a.   Importantly, the letter banning Mr. Pryor in January 2019 was narrowly tailored to address the principal's concern at her specific school.  DPS did not issue a blanket ban on Mr. Pryor's ability to participate in DPS activities as Defendants did with the Ban Letter in 2022.  The Ban Letter does not include any allegations regarding the events leading to Kayla Grayson's letter, which occurred over three years ago.

    b.   Importantly, a few months after the January 2019 letter, DPS solicited Mr. Pryor to participate on a panel to interview and select DPS' new Executive Director of Equity and Culture.  [See Exhibit 5, Email Invitation to Mr. Pryor dated April 2, 2019.]  If Mr. Pryor presented such a danger, DPS would not have asked him to participate in such an important role in choosing executive staff.

15. Mr. Pryor was not aware that Elizabeth Mendez ("Ms. Mendez") submitted a complaint to DPS regarding Mr. Pryor until after DPS issued its Ban Letter.  As alleged in the Complaint, Mr. Pryor sharply criticized Ms. Mendez and her staff for their egregious, and seemingly intentional, actions in interfering with the School Choice process for the STEAM Academy.  [*See* Complaint, ¶¶ 25-31; Exh. 1, Facebook posts, February 19, 2021 – Let's Talk about the DPS Choice & Enrollment Department (headed by Liz Mendez) & their Egregious Failure to Serve Black Students & Families.]

16. Mr. Pryor agrees that Dana Risch investigated Ms. Mendez's allegations. Ms. Risch admitted that she did not interview Mr. Pryor, and there is no indication that Ms. Risch investigated Mr. Pryor's concerns about the Choice department's actions. Ms. Risch "[did] not find any evidence of a Board Policy AC-RI violation.  The investigation did not reveal any evidence that [Mr.] Pryor engaged in discriminatory behaviors toward [Ms.] Mendez."  [*See* Exhibit 58, p. 4 (alterations supplied).]  [Id.]

17. In August 2021, Regional Instructional Superintendent Antoinette Hudson ("Ms. Hudson") complained to DPS that Mr. Pryor discriminated against her based on age, gender, and race.  The investigator prepared a statement based on Mr. Pryor's interview. [See Exhibit 6, Brandon Pryor Statement re Antoinette Hudson Investigation 10.28.2021.] As mentioned in Mr. Pryor's statement, Ms. Hudson engaged in numerous unprofessional acts toward Mr. Pryor.  DPS ignored Mr. Pryor's request to file a complaint against Ms. Hudson.  Perhaps most egregious is Ms. Hudson's attempt to interfere with Mr. Pryor's working relationship with Kimberly Grayson (former principal at Dr. Martin Luther King, Jr. Early College ("DMLK")), who was assisting Warriors for High Quality Schools with their new school application for the STEAM Academy.  Kimberly Grayson is the sister of Kayla

Grayson (former principal at FPW). [See ¶ 14.]  Ms. Hudson questioned Kimberly Grayson about why she wanted to work with Mr. Pryor in light of his legal claims against DPS and her sister, Kayla Grayson.  Ms. Hudson tried to persuade Kimberly Grayson not to work with Mr. Pryor and discussed confidential information with Kimberly Grayson regarding Mr. Pryor's legal claims against DPS and Kayla Grayson.

    a.  Ms. Hudson also called DPS Security[2] as her personal security to an event at DMLK celebrating the Know Justice Know Peace Resolution.  Ms. Hudson was not invited to the event.  However, Kimberly Grayson specifically invited Mr. Pryor because he mentored the students at DMLK and advocated with the students for the BOE to pass the Know Justice Know Peace Resolution.

    b.  Ms. Hudson caused disruption in the zero-year planning for the STEAM Academy in a number of other ways, including, but not limited to, cancelling planning meetings to which she was not invited and was not a participant and attempting to restrict Mr. Pryor's access to the STEAM Academy.  [See Exh. 6, Mr. Pryor Statement, October 28, 2021.]

    c.  Ms. Hudson admitted that she intentionally tried to restrict Mr. Pryor's access to the STEAM Academy. [*See* Exhibit 56, Investigations Report, p. 7.]  However, Regional Instructional Superintendent Rachel Payne amended the DPS policies so that Mr. Pryor, a co-founder, could have

---

[2] The same DPS Security who responded to the handcuffing of Mr. Pryor's seven-year-old child showed up during the event at DMLK, which caused anxiety for Mr. Pryor and his seven-year-old son who also attended the event.

access to the building.  [*See* Exhibit 7, Rachel Payne Email re Revised Covid Policy to Include School Founders' Access to Schools 9.10.2021.]

18. Mr. Pryor agrees that DPS paid David Vogel of Employment Matters, LLC Flynn Investigations Group to investigate Ms. Hudson's allegations.  Mr. Vogel expressly concluded that "[Mr.] Pryor **did not** violate District Policy AC or AC-R1." [Exhibit 56, p. 3 (emphases and alteration supplied).]

19. Despite the letter dated January 2022, Mr. Pryor's access to the STEAM Academy was not restricted until Defendants issued the unlawful Ban Letter.  Mr. Pryor was never required to turn in his badge, which allows him special access to the STEAM Academy.

20.  Mr. Pryor was not aware that Neisa Lynch ("Ms. Lynch") submitted a complaint to DPS until after the Ban Letter was issued.  Defendants have not investigated Ms. Lynch or any of Deputy Smith's associates at Montbello High School for the concerns Mr. Pryor raised about the JV Game being stolen.

21. DPS' internal investigator made conclusory arguments that the Facebook posts were somehow harassing in nature.  There was no discussion or analysis of how Mr. Pryor's Facebook posts constituted harassment under DPS Policy AC-R1.

22. On October 12, 2022, DPS' BOE held a work session to discuss the facility needs for the STEAM Academy and Superintendent Marrero's recommendation to close MCT. [*See* Exhibit 8, DPS Recommendation for MCT Closure 10.12.2022.] During the meeting, DPS argued that the current space for the STEAM Academy was sufficient because of the STEAM Academy's alleged low enrollment numbers.  After the BOE work session, Mr. Carpenter and Ms. Mendez rode down an elevator with Mr. Pryor, and they began discussing the BOE work session topics.  When they arrived in the lobby of DPS

headquarters, the conversation grew heated, and Mr. Pryor became passionate about the needs of the Black and Latinx students at the STEAM Academy.  Mr. Pryor mentioned how Ms. Mendez's mistake in incorrectly identifying the STEAM Academy's address during choice and enrollment impacted the STEAM Academy's overall enrollment.  He also addressed his concerns that DPS intentionally placed students on a waitlist for the STEAM Academy during the 2022 School Choice process, claiming there was no facility space.  [*See* Exhibit 9, Video of Pryor, Carpenter, and Mendez, 10.12.2022.]

      a.  As noted in the video, the DPS security guard merely stood next to Mr. Pryor as he continued speaking.

      b.  Although Ms. Mendez claims she felt threatened, she stayed and listened. Ms. Mendez even walked up to Mr. Pryor and stood next to him as he spoke with his hands crossed in front of him.  [*See* Exhibit 9, Video 10.12.22.]

23. Mr. Pryor agrees that Defendants issued their unlawful Ban Letter on October 18, 2022 after Mr. Pryor and several other advocates appeared for DPS' public comment and openly criticized Defendants for their discriminatory treatment of Black students, educators, and leaders on October 17, 2022.  [*See* Exhibit 10, Public Comment List 10.17.2022.]

24. Mr. Pryor denies that he violated any DPS policy.

25. The overreaching Ban Letter speaks for itself, and Mr. Pryor denies all of the allegations against him contained therein.

26. Defendants banned Mr. Pryor from coaching in retaliation for Mr. Pryor exercising his free speech in advocating against Defendants' racist and oppressive practices.  To be sure, DPS previously attempted to ban Mr. Pryor from coaching, but Mr. Pryor

successfully advocated for himself and other minorities to coach in 2019.  [*See, e.g.*, Exhibit 11, Pryor Email to DPS re Reconsideration for Coaching, 10.24.2019.]  DPS employees, including Jennifer Hollady[3], also advocated for Mr. Pryor's eligibility to coach, despite Mr. Pryor's harsh criticism of those DPS employees.  However, in the Ban Letter, Defendants rest on a false basis to justify banning Mr. Pryor from coaching.  [*See* Complaint,  ¶¶70-74.]   Defendants even admit that DPS' "new" leadership (i.e., Superintendent Marrero and Deputy Smith) made the decision to render Mr. Pryor ineligible to coach or otherwise volunteer for DPS.  [Ban Letter, p. 6.]

27. The Ban Letter does identify an appeal process.

28. Mr. Pryor submitted an appeal on October 26, 2022, demanding that Defendants rescind the Ban Letter in its entirety.  [*See* Exhibit 62, Samantha Pryor Letter, October 26, 2022.]

29. Deborah Staten ("Ms. Staten") prepared a letter dated November 9, 2022. [Exhibit 63, Deborah Staten Letter November 9, 2022.]

30. Ms. Staten's letter does not grant Mr. Pryor's appeal.  Ms. Staten's letter only lifted the ban on Mr. Pryor's ability to speak at public comment, which was perhaps the most egregious example of retaliation and a direct violation of Mr. Pryor's First Amendment rights.  [*See* Id.]

---

[3] Mr. Pryor publicly criticized Ms. Holladay. [*See, e.g.*, Exhibit 1, Facebook posts, Do Not Want List 4.25.2018.] However, Ms. Holladay maintained a professional relationship with, and supports, Mr. Pryor, despite his advocacy towards her as a public employee.  [*See* Exhibit 12, Jennifer Holladay Statement dated October 22, 2022.]

**ARGUMENT**

To obtain a preliminary injunction, a moving party must demonstrate: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1208 (10th Cir. 2009).  In this case, Mr. Pryor satisfies all of the elements required for preliminary injunctive relief contrary to Defendants' arguments.

**I.     MR. PRYOR HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF HIS CLAIM FOR FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983 AND COLORADO STATE CONSTITUTION**

"Although retaliation is not expressly discussed in the Constitution, it may be actionable inasmuch as governmental retaliation tends to chill citizens' exercise of their constitutional rights." Lackey v. County of Bernalillo, 1999 U.S. App. LEXIS 75 *10 (10th Cir. filed Jan. 5, 1999) (citing American Civil Liberties Union of Md., Inc. v. Wicomico County, 999 F.2d 780, 785 (4th Cir. 1993); Perry v. Sindermann, 408 U.S. 593, 597, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972)). "Any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." Lackey, 1999 U.S. App. LEXIS at *10-11 (citing Smart v. Board of Trustees, 34 F.3d 432, 434 (7th Cir. 1994); Reporters Committee for Freedom of the Press v. AT&T Co., 192 U.S. App. D.C. 376, 593 F.2d 1030, 1064 (D.C. Cir. 1978)).

As Defendants recognize, "First Amendment jurisprudence differentiates between claims from members of the general public and claims from public employees and others

with specific connections to a public entity." [Response, p. 13.] Critically, Defendants admit that "Mr. Pryor is not a District employee". [Response, p. 7, ¶ 13.] Yet, Defendants argue that the Garcetti/Pickering test governs this Court's analyses as to whether Mr. Pryor will succeed on a First Amendment retaliation claim.

A.   The Pickering Balancing Test Does Not Apply In this Case

While Defendants agree that the Pickering Test applies to employees, Defendants argue that the Pickering test also applies to "volunteers for public entities". [Response, p. 15.] In an attempt to support their argument, Defendants rely on Anderson v. McCotter, 100 F.3d 723 (10th Cir. 1996).

However, Defendants' reliance on Anderson[4] is misplaced. The Tenth Circuit Court of Appeals expressly held that the plaintiff in Anderson "***was not a volunteer—she was obviously a government employee***." Anderson, 100 F.3d at 726 (emphases added).

In Anderson, the plaintiff was a paid intern who "worked under the direction of officials at [the defendant public entity] and was subject to [the defendant public entity's] control." Id. (alterations supplied). Those facts simply do not exist in this case. Mr. Pryor does not work under Defendants' direction, and he is not subject to Defendants' control as if he were an employee. The Pickering test necessarily includes an analysis of an employee's duties and job responsibilities. [*See, e.g.*, Response, pp. 14-15 (*citing* Garcetti v. Ceballos, 547 U.S. 410, 421 (2006) (referencing "a genesis in the job responsibilities of a public employee could be disciplined").]

---

[4] Defendants also rely on Cooper v. Town of Bar Nunn, 257 F.Supp.2d 1363 (D. Wyo. 2003) for the same proposition. However, like Anderson, Cooper involved a public employee, not a volunteer.

Notably absent from Defendants' Response is any analysis of the <u>Pickering</u> test as applied to the facts of this case.  Mr. Pryor does not have any job responsibilities or duties with DPS because he is not a DPS employee or contractor.  Mr. Pryor's speech about public concerns is not connected to any job responsibilities.  Even if the <u>Pickering</u> test applies, which it does not, Defendants cannot establish a legitimate governmental interest for issuing a "complete and total ban" on Mr. Pryor.

### B. <u>The Tenth Circuit Has Established Specific Framework for Analyzing Non-Employees' First Amendment Retaliation Claims</u>

Notably, <u>Anderson</u> was decided before the Tenth Circuit Court of Appeals established the appliable framework for assessing a non-employee's First Amendment retaliation claims.  *See* <u>Worrell v. Henry</u>, 219 F.3d 1197, 1212 (10th Cir. 2000) (*citing* <u>Lackey</u>, *supra*).  In <u>Worrell</u>, the Tenth Circuit expressly held that "an alternative to the <u>Pickering</u> balancing is warranted when the allegations of retaliatory conduct are directed at a defendant who is not the plaintiff's employer and when there is no contractual relationship between them."  <u>Worrell</u>, 219 F.3d at 212.

Importantly, "it is the government's powers and responsibilities as an employer that warrant restrictions on speech that would not be justified in other contexts."  <u>Id.</u> at 1210.  Indeed, "[e]mployers have heightened interests in controlling speech made by an employee in his or her professional capacity.  Official communications have official consequences, creating the need for substantive consistency and clarity.  Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission."  [Response, p. 14 *quoting* <u>Garcetti</u>, 547 U.S. at 422-23.] Contrarily, "[t]he government cannot restrict the speech of the public at large just in the name of efficiency."  <u>Worrell</u>, 219 F.3d at 212 (*quoting* <u>Waters</u>

v. Churchill, 511 U.S. 661, 675 (1994) (alteration supplied)). "By focusing on the protected activity, the effect of the defendant's actions, and the defendant's intent, this approach reduces the risk of infringement of protected speech that might result from application of the Pickering balancing." Worrell, 219 F.3d at 1212.

Ultimately, the Tenth Circuit concluded that the elements in Lackey, ***"rather than the Pickering balancing*, *provide[ ] the appropriate framework for assessing First Amendment claims against a defendant who is neither an employer nor a party to a contract with the plaintiff*.**" Id. (*citing* Lackey, *supra*) (alterations and emphases supplied). The Tenth Circuit analyzed, and expressly adopted, the factors set forth in Lackey as follows (hereinafter the "Lackey Factors"): "(1) the plaintiff 'was engaged in constitutionally protected activity'; (2) that the defendant's actions caused the plaintiff 'to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity'; and (3) that the 'defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct'." Worrell, 219 F.3d at 1212 (*quoting* Lackey, *supra*) (collecting cases). *See also* Tachias v. Los Lunas Sch. Bd. of Educ., 2022 U.S. Dist. LEXIS 193054 at *19-20 (D.N.M filed Oct. 24, 2022) (*applying* Lackey Factors in denying individually named defendant's motion for summary judgment based on qualified immunity arguments in First Amendment retaliation claim brought by community members and parents against defendant superintendent of school district).

Under the Lackey Factors, "the defendant's intent is the key element." Worrell, at 1215. "An action taken in retaliation for the exercise of constitutionally protected rights is

actionable under §1983 even if the act, when taken for a different reason, would have been proper." Id. (citing cases) (internal quotes omitted).

    1.  Mr. Pryor Was Engaged in Constitutionally Protected Activity

In their Response, Defendants argue that Mr. Pryor has not alleged or presented evidence that he was engaged in constitutionally protected activity. [Response, p. 18.] Defendants further argue that Mr. Pryor has not shown that any constitutionally protected activity is connected to the Ban Letter. [Id.] Defendants' arguments are belied by the allegations set forth in the Complaint and in the Motion. [*See* Motion, p. 2-3 (*citing* Complaint ¶¶16-38, 39-58).]

The Complaint lays out a timeline of Mr. Pryor's advocacy, inclusive of dates and the subjects about which he was advocating. [Id.] The timeline demonstrates that DPS issued the Ban Letter within weeks and days of Mr. Pryor publicly advocating on Facebook against Superintendent Marrero, Deputy Smith, Ms. Lynch, Mr. Carpenter, Ms. Mendez, and other public officials who were causing harm to DPS students. [Id.] The Complaint does much more than simply point to temporal proximity between Mr. Pryor's advocacy and the issuance of Defendants' Ban Letter.

As alleged in the Complaint, Mr. Pryor was informing community about, and advocating against, DPS' systemic discrimination against Black and Latinx students. [*See* Exhibit 1, Facebook posts, generally.] Mr. Pryor also specifically alleged that Defendants retaliated against him as a direct result of the large number of community members who advocated against Superintendent Marrero's discriminatory practices during the BOE's public comment session on October 17, 2022. [*See* Exhibit 10, Public Comment Speakers List 10.17.2022.]

The public comment session involved four main subject areas:  (1) **Know Justice, Know Peace, The Take Podcast** - Defendants' discriminatory actions in filing a trademark against its own Black female students relating to their constitutionally protected creation; (2) **American Indian Academy of Denver** – Defendants' egregious attempt to close a school designed to serve American Indian students without valid justification; (3) the **STEAM Academy** – Defendants' failure to keep its promises in finding a long-term facility for the students at the STEAM Academy, which resulted in severe inequities for Black and Latinx students; and (4) **Recommended Closure of MCT** – Defendants' baseless attempt to close MCT because Defendants failed to find a long-term facility solution for the STEAM Academy.  [*See* Exh. 10, Public Comment List.]  Many community members specifically criticized Superintendent Marrero as he was performing other tasks while DPS students, educators, and parents were speaking to him during public comment.

The very next day, on October 18, 2022, Superintendent Marrero issued a "DPS Community Update" in response to the community's advocacy during public comment on October 17, 2022.  [*See* Exhibit 4, DPS Community Update 10.18.2022.]  Superintendent Marrero was clearly bothered by the community's criticisms, and he specifically addressed each of the four subject areas that were addressed in the previous night's intense public comment session.  [Id.]  Later that day, Defendants served Mr. Pryor with the Ban Letter.  The temporal proximity, along with evidence that "the protected speech implicated the individual defendant in wrongdoing" is sufficient to establish an inference of retaliatory motive. *See, e.g.*, Couch v. Bd. of Trs. of the Mem. Hosp., 2009 U.S. App. LEXIS 25182 at *25 (10th Cir. 2009) (*quoting* Baca v. Sklar, 398 F.3d 1210, 1221 (10th Cir. 2005); Walton v. Powell, 821 F.3d 1204, 1214 (10th Cir. 2016) (citing cases).

Unfortunately, Defendants make wholly conclusory arguments that Mr. Pryor has somehow been abusive, bullying, threatening, and intimidating, which resulted in the Ban Letter.  [Response, p. 18.]  Rather than pointing to actual evidence of such conduct that would warrant the Ban Letter, Defendants merely cite to the Motion.  [See Id. (*citing* the Motion, p. 3-6).]

Defendants' conclusory arguments about Mr. Pryor are unsupported.   Nothing about the Ban Letter supports Defendants' arguments.  Nor did the Ban Letter point to any actual evidence that Mr. Pryor ever engaged in any abusive, bullying, threatening, or intimidating conduct.  As the United States Supreme Court has held, the "debate on public issues…may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."  Tachias, supra at *22 (*quoting* New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964).  Simply because Mr. Pryor is a passionate advocate who holds public employees accountable does not equate his actions to intimidation, harassment, or bullying.

In the Ban Letter, Defendants only identify a compilation of Mr. Pryor's Facebook posts, a video of Mr. Pryor's after hours conversation Mr. Carpenter and Ms. Mendez at DPS headquarters, and various investigations involving text messages or Zoom conferences.  None of those instances demonstrate that Mr. Pryor's conduct somehow fell outside of the purview of First Amendment protections.

Defendants have failed to cite any legal authority indicating that Mr. Pryor's speech was somehow not protected under the First Amendment.   Indeed, "safeguarding criticisms of the government is a core purpose of the First Amendment" and "almost all speech is protected other than 'in a few limited areas'."  Tachias, *supra* at * 21-22 (*quoting*

United States v. Stevens, 559 U.S. 460, 468 (2010); R.A.V. v. St. Paul, 505 U.S. 377, 382-83 (1992)).  Defendants have not argued or presented evidence demonstrating that Mr. Pryor's speech fell into one of the categories of unfavored speech.  The United States Supreme Court "has declined efforts to create new categories of disfavored speech."  Tachias, *supra* at *22 (citing cases).

2. Defendants' Unlawful Ban Letter Caused Mr. Pryor to Suffer Injuries That Would Chill a Person of Ordinary Firmness from Continuing to Engage in Free Speech

Next, Defendants assert that they have not caused Mr. Pryor to suffer any injury, much less an injury that would chill an ordinary person from free expression. [Response, p. 18.]  In so arguing, Defendants reason that Mr. Pryor "has no right to access school property or participate in coaching or volunteer activities."   [Response, p. 18 (citing cases).]  Defendants' arguments could not be further from the truth.

First, there can be no doubt that Defendants' extreme measures in banning Mr. Pryor from all DPS properties and activities has presented a chilling effect on speech. Members of the community were already hesitant to speak out strongly against Defendants due to fears of retaliation.  Community members commended Mr. Pryor for his courage in standing up for what is right and for working tirelessly to serve, and improve conditions for, minority students and his community.  DPS purposefully chose to ban Mr. Pryor, one of the most powerful and strongest voices in the community, to punish and silence him and to make an example for other members of his community.

Second, even if Mr. Pryor has no alleged constitutional right to be on DPS school property, to volunteer, or to coach football, Mr. Pryor was enjoying all of those benefits before DPS illegally banned him.  "For at least a quarter-century, [the United States

Supreme] Court has made it clear that **even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, … [the government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests— especially, his interest in freedom of speech**." <u>Anderson</u>, 100 F.3d at 726-27 (emphases and alterations supplied).

The timeline in this case illustrates that Defendants did not ban Mr. Pryor from DPS until after Mr. Pryor began publicly speaking out against Superintendent Marrero, Deputy Smith, and Deputy Smith's friends. Despite years of alleged investigations regarding Mr. Pryor of which Mr. Pryor was unaware, DPS has never banned Mr. Pryor from all of DPS. After the STEAM Academy was approved, Mr. Pryor was quiet for over one year while working behind the scenes to build the school and its partnerships. He attempted to work with Superintendent Marrero and Deputy Smith without the need for public advocacy. However, it became apparent that Defendants were affirmatively creating roadblocks for the STEAM Academy's success and engaging in other blatant discriminatory and retaliatory acts against other Black people in the community. Therefore, Mr. Pryor began speaking out against Defendants. Even if there was some valid basis for a "complete and total ban" on Mr. Pryor, which there is not, Defendants' Ban Letter was directly motivated by, and issued because of, Mr. Pryor's constitutionally protected speech.

Third, Defendants' extreme measure in banning Mr. Pryor from all DPS properties and activities is far from reasonable. There is simply no rational, objective relationship between the events set forth in the Ban Letter and Mr. Pryor's involvement with the youth. There is no evidence that Mr. Pryor somehow harmed, threatened, abused, or intimidated

any students.  Yet, Defendants have unreasonably banned Mr. Pryor from being present at the STEAM Academy or at any DPS school, volunteering as a coach or in any other capacity, and being present on DPS property.  Defendants have failed to explain how Mr. Pryor's Facebook posts or in person conversations with DPS employees has any relationship to Mr. Pryor's daily presence at the STEAM Academy.

Fourth, Defendants fail to present any evidence to support their contention that Mr. Pryor's conduct somehow "disturbed the tranquility of the school and district operations." [Response, p. 19.]  There is no evidence that Mr. Pryor was physically present on any school grounds during his advocacy or that he somehow disturbed district operations. Defendants merely make conclusory arguments without any evidentiary support.

Fifth, Defendants contend that Mr. Pryor can no longer claim he was injured by being banned from public comment because Defendants recently agreed to remove that portion of the Ban Letter.  [Response, p. 19-20.]  Yet, the United States Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Herbert, 828 F.3d at 1263 (quoting Elrod v. Burns, 427 U.S. 347, 373 (1975)).

3. Defendants' Unlawful Ban Letter Was Substantially Motivated as a Response to Mr. Pryor's Exercise of Constitutionally Protected Conduct

Defendants do not separately analyze this element in their Response.  However, as articulated above, there is plenty of evidence that demonstrates that Defendants' unlawful Ban Letter was substantially motivated by Mr. Pryor's exercise of constitutionally protected speech.

## II.   <u>MR. PRYOR AND OTHERS WILL SUFFER IRREPARABLE INJURY WITHOUT THE INJUNCTION</u>

Defendants argue that Mr. Pryor cannot show that his First Amendment rights were violated now that Defendants rescinded the ban on public comment.  Defendants insist that Mr. Pryor is still able to attend all school events.  [Response, p. 21-22.] However, Defendants' Ban Letter still unconstitutionally bans Mr. Pryor from being able to fully participate in his children's school-related activities such as volunteering for school field trips. [*See* Exhibit 61, Ban Letter, p. 6; Exhibit 63, Staten letter.]  The Ban Letter still imposes a "complete and total ban" on Mr. Pryor's ability to be present at the STEAM Academy or any DPS school property, except under various vague and ambiguous conditions.

Ironically, Defendants claim their "restrictions do ***nothing whatsoever*** to interfere with or restrict [Mr. Pryor's] ability to use Facebook to advocate or make his voice publicly heard."  [Response, p. 22 (emphases in original) (alteration supplied).]  Yet, Defendants used Mr. Pryor's Facebook posts as a basis for issuing the Ban Letter in the first instance. [*See* Exhibit 61, Ban Letter, p. 2-4.]  Defendants even identified Mr. Pryor's appearance on "Brother Jeff's podcast multiple times", which is a community news network that airs on Facebook, as a reason for issuing the Ban Letter.  [Exhibit 61, Ban Letter, p. 3-8.]

Lastly, Defendants argue that Mr. Pryor is unable to establish that he will suffer an irreparable injury because he does not have a right to be present at the STEAM Academy. However, Mr. Pryor enjoyed the benefit, and provided a valuable governmental benefit, by being present at the STEAM Academy nearly every day before Defendants issued their unlawful Ban Letter.

Mr. Pryor even had special access to the STEAM Academy, as evidenced by the badge he was issued.  He was never required to leave his driver's license at the front desk when visiting the school as other visitors were required to do under DPS Policy KI. [*See* Exhibit 55, Policy KI.]  Mr. Pryor was continuing to build the STEAM Academy in its critical startup years by forming valuable community partnerships and relationships with students, administrators, and educators.  Importantly, Mr. Pryor is in a very unique position because DPS has never had a community member design and found a DPS innovation school.  There are very few policies that apply to Mr. Pryor as a founder of a DPS school, most of which he advocated for the BOE to create and implement.  [*See, e.g.,* Exhibit 7, Rachel Payne Email re Revised Covid Policy to Include School Founders' Access to Schools 9.10.2021.]

In any event, even if Mr. Pryor did not have a right to any of the benefits he enjoyed before the Ban Letter was issued, Defendants issued the Ban Letter only after Mr. Pryor began publicly calling out Superintendent Marrero and Deputy Smith in August, September, and October 2022.  There is no question that Mr. Pryor and others will suffer irreparable injury without the injunction.  *See* Herbert, 828 F.3d at 1263-64; Elrod, 427 U.S. at 373; Kikumura v. Hurley, 242 F.3d 950, 963 (10th Cir. 2001).  *See also* Koontz v. St. Johns River Water Mgmt. Dist., 133 S. Ct. 2586, 2594 (2013) (holding that the "Supreme Court 'ha[s] said in a variety of contexts that the government may not deny a benefit to a person because he exercises a constitutional right.'") (*quoting* Regan Taxation with Representation of Wash., 461 U.S. 540, 545 (1983) (alteration supplied)).

### III.   THE BALANCE OF EQUITIES WEIGHS IN MR. PRYOR'S FAVOR

Mr. Pryor's irreparable harm heavily outweighs any harm Defendants could possibly bear if the Court issues a preliminary injunction.  When evaluating whether the Ban Letter serves a compelling governmental purpose, the Court must inquire into the circumstances of why Defendants issued the Ban Letter.  *See, e.g.,* Koontz, 283 F.Supp.3d at 1022 (*citing* Doe v. City of Albuquerque, 667 F.3d 1111, 1132 (10th Cir. 2012).  Contrary to Defendants' arguments, the Ban Letter is constitutionally infirm because it was issued only after, and as a direct result of, Mr. Pryor engaging in his free speech rights by speaking out publicly against Defendants.

Defendants claim that they "have not prevented [Mr. Pryor] from calling 'out public employees' or making scathing or repeated criticisms that make those employees feel uncomfortable."  [Response, 24 (citing the Motion, p. 8).]  Defendants further claim Mr. Pryor's "speech on Facebook or on the radio about any issue related to DPS remains completely unfettered by DPS' restrictions on him directly related to DPS property." [Response, p. 24.]  However, that is precisely what Defendants have done.  It is unclear how Mr. Pryor's speech on Facebook can now be unfettered if Defendants banned Mr. Pryor ***because of*** his Facebook posts and because his advocacy makes people feel uncomfortable.  [Ban Letter, 2-6.]

### IV.   THE PRELIMINARY INJUNCTION FURTHERS THE PUBLIC INTERESTS

Defendants argue that Mr. Pryor failed to demonstrate that the Ban Letter had a chilling effect on his free speech.  Yet, Defendants did, in fact, prevent Mr. Pryor from exercising his free speech when it banned him from public comment.  Also, the mere fact

that Defendants issued a "complete and total" ban against Mr. Pryor for speaking out against them presents a chilling effect on free speech.

Defendants again argue that their restrictions impose reasonable limits on the time, place, and manner of speech.  [Response, p. 24 (*citing* Perry Educ. Ass'n, 60 U.S. at 46-48).]  However, Defendants' blanket ban on Mr. Pryor is very extreme and far reaching, with no rational relationship to him being present to help build the STEAM Academy, volunteer as a coach or otherwise volunteer.  Granting the preliminary injunction would replenish the status quo of Mr. Pryor's ability to engage in the same activities in which he engaged before the Ban Letter was issued.  It would also restore the public's confidence in their ability to exercise First Amendment Free Speech rights without fear of Defendants' retaliation.

Defendants argue that a preliminary injunction "would undermine Defendants' reasonable efforts to preserve the tranquility of DPS and protect DPS staff members from bullying and harassment."  [Response, p. 24]. However, Defendants' status quo does not involve tranquility, nor does it adequately protect its employees or students.

As Defendants have repeatedly admitted, DPS has a deep and long history of systemic racism and discrimination against Black educators, students, and families that has continued to date.  [*See, e.g.*, Exhibit 13, The Bailey Report, *An Examination of Student and Educator Experiences in Denver Public Schools Through the Voices of African-American Teachers and Administrators*; Keyes v. Congress of Hispanic Educators, 902 F. Supp. 1 (D. Colo. 1995).]  These are the very reasons Mr. Pryor has been passionately advocating and informing community about Defendants' unlawful actions.  The First Amendment was designed for the type of advocacy in which Mr. Pryor

has engaged for the past five years.  *See* <u>Animal Legal Def. Fund v. Kelly</u>, 9 F4th 1219, 1227-28 (10th Cir. Court of Appeals 2021) (identifying conduct and dissemination of information as categories of protected speech under the First Amendment).  Defendants must be estopped from maintaining the "complete and total ban" it placed against Mr. Pryor.

<u>**CONCLUSION**</u>

There can be no doubt that Defendants issued the Ban Letter in retaliation for Mr. Pryor exercising his free speech rights.  As demonstrated above, Mr. Pryor has satisfied all the required elements for a preliminary injunction.  Therefore, for the reasons and legal authority set forth herein, and in the Motion, Mr. Pryor respectfully requests that this Court grant injunctive relief and issue any other relief this Court deems just and proper.

Dated this 1st day of December 2022.

Respectfully submitted,

**ATTORNEY FOR PLAINTIFF**
**BRANDON PRYOR**

*/s/Samantha L. Pryor*
Samantha L. Pryor, Esq. #39194
THE HALLIBURTON LAW FIRM, LLC
8354 Northfield Blvd. Suite 3700
Denver, CO 80238
303-803-1060
spryor@thehalliburtonlawfirm.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on this 1st day of December 2022, I served a correct copy of the foregoing **REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** on the following parties via ECF:

**ATTORNEYS FOR DEFENDANTS**

Hall & Evans, LLC

Andrew D. Ringel, Esq.

Katherine Hoffman, Esq.

Jared Ellis, Esq.


_s/ Kelie Kyser_
Kelie Kyser
The Halliburton Law Firm, LLC