# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 1:22-cv-02886-JLK

BRANDON PRYOR,

     Plaintiff,

v.

SCHOOL DISTRICT NO. 1 d/b/a DENVER PUBLIC SCHOOLS;
SUPERINTENDENT ALEX MARRERO in his Individual and Official Capacities; and
DEPUTY SUPERINTENDENT ANTHONY SMITH in his Individual and Official Capacities,

     Defendants.

---

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION
---

Kane, J.

     "The government may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech—even though the person has no right to the valuable governmental benefit and even though the government may deny him the benefit for any number of reasons." *Seamons v. Snow*, 84 F.3d 1226, 1236 (10th Cir. 1996) (internal quotation marks and citation omitted). In this case, Plaintiff Brandon Pryor alleges that Defendants Denver Public Schools ("DPS"), its Superintendent Alex Marrero, and its Deputy Superintendent Anthony Smith ("Deputy Smith") have violated his federal and state constitutional rights by authorizing and imposing restrictions on his access to DPS property and his involvement in its schools and programs in retaliation for his protected speech. Presently before me is Mr. Pryor's Motion for Preliminary Injunction (ECF No. 4), seeking to enjoin Defendants from enforcing the restrictions placed on him and to require Defendants to restore his previous access as a founder of a DPS school and his status as a volunteer football coach.

Defendants contend the restrictions on Mr. Pryor are necessary due to a series of complaints DPS received concerning alleged "unprofessional, inappropriate and harassing conduct by Mr. Pryor from multiple DPS employees." Resp. at 2, ECF No. 14. I held a seven-day hearing on the Motion and now find that Mr. Pryor is likely to succeed on the merits on his first claim but is not entitled to the full relief his Motion requests. Consequently, I grant Mr. Pryor's Motion in part and issue a limited preliminary injunction.

## I. FACTS

Denver Public Schools has a long history of systemic racism and discrimination. *See generally* The Bailey Report, Ex. 13[1]; Pat Pascoe, *A Dream of Justice: The Story of Keyes v. Denver Public Schools* (2022). Since 2017, Mr. Pryor has advocated for education justice in DPS. Mr. Pryor is employed by Denver Metro Community Impact as a community site coordinator, and his work involves youth violence prevention. He is one of three founders of the nonprofit Warriors for High Quality Schools. He has also been a volunteer coach for the Warriors regional football team in Far Northeast Denver under Coach Tony Lindsay.[2] Mr. Pryor's advocacy has included speaking at DPS Board public comment sessions and posting commentary and videos on Facebook. *See* Pryor Facebook Posts, Ex. 1. He has pressed DPS to provide libraries, improved weight room facilities, and lights on the athletic fields in Far Northeast Denver. He took up issues such as teachers coaching at schools other than where they teach because he was concerned it would take students out of the community and reduce funding for the local schools. Through Warriors for High Quality Schools, Mr. Pryor pushed DPS to

---

[1] The Court uses a unified exhibit numbering system. The exhibits correspond to those submitted with the parties' filings and those admitted at the preliminary injunction hearing.

[2] Coach Lindsay was the first Black head coach to win a high school state championship in Colorado.

reopen Montbello High School in Far Northeast Denver and later sought DPS approval for the

Robert S. Smith STEAM Academy (the "STEAM Academy"), a DPS high school modeled after

Historically Black Colleges and Universities. In August 2019, the DPS Board of Education

("Board") approved the formation of the STEAM Academy. *See* Oct. 12, 2022 Board Meeting

Slides, Ex. 8 at 6.

The DPS Board is the governing body of DPS. The Board appoints the Superintendent

who serves as the Chief Executive Officer of DPS. The Board has undergone a recent policy

shift. Under the new "policy governance" model, "[t]he Board's job is to set the vision and

policies that will enable district students to be academically successful"; its job is not the

"resolution of operational issues." Policy GP.10-E, Ex. 2 at 7.


**2019: Incident at the School of Mr. Pryor's Son**

On January 14, 2019, Mr. Pryor went to his son's school because his son had been

repeatedly bullied, and although Mr. Pryor had reported it to the principal, nothing had been

done about the bullying. Mr. Pryor entered his son's second-grade classroom and stated to the

class and teacher that anyone who threatened his son would have to deal with him and their

parents. Grayson-Yizar Letter, Ex. 57 at 1. Afterwards, the principal attempted to meet with Mr.

Pryor in her office, but Mr. Pryor "began talking loudly and using profane and verbally abusive

language." *Id.* As a result, the principal sent a letter to Mr. Pryor asserting that he had violated

DPS Policy KFA, which outlines rules for individuals' conduct while on or using DPS property.

Policy KFA, Ex. 53 at 1. The Policy states:

> Persons using or upon school district property, including all district buildings [and]
> parking lots . . .[,] shall not engage in:

      1. Any conduct intended to obstruct, disrupt or interfere with teaching, research, service, administrative or disciplinary functions, or any activity sponsored or approved by the Board.

      2. Physical abuse of or threat of harm to any person or school district owned or controlled property or at school district sponsored or supervised functions.

      * * *

      7. Profanity or verbally abusive language.

      8. Any conduct constituting a breach of any federal, state or city law or duly adopted policy and/or regulation of the Board.

*Id.* Based on this Policy, the principal's letter barred Mr. Pryor from entering the school grounds and interacting with school employees without prior approval. *Id.* at 1-2. These restrictions only lasted until the end of the 2018 – 2019 school year, *id.* at 1, and the principal did reach out to Mr. Pryor and invite him to the school for meetings during that period.

      Despite this incident, DPS employees asked Mr. Pryor to participate in interviews for its Executive Director of Equity and Culture in April 2019 and to join a work group to build a DPS community engagement framework in July 2020. Apr. 4, 2019 DPS Email, Ex. 5 at 1; Jul. 24, 2020 DPS Email, Ex. 18 at 1.

**2020: Initial Hudson Interaction**

      A year and a half later, the STEAM Academy was in its planning year and was preparing to receive students the following fall. Its principal did not feel like she could lead because of Mr. Pryor's influence. As a result, her supervisor, Dr. Antoinette Hudson, the Regional Instructional Superintendent for the Far Northeast Region, reached out to Mr. Pryor. After he did not immediately return her call or respond to her email, Dr. Hudson cancelled the STEAM Academy weekly meeting. Mr. Pryor called Dr. Hudson the following morning, on October 23, 2020. The

call began as a productive conversation but became heated. Dr. Hudson reported to DPS that Mr. Pryor stated on the call: "[L]et me be clear, I never wanted you, if you do anything to retaliate against me, there will be problems." Oct. 23, 2020 Hudson Summary, Ex. 69 at 2. She also recalled him becoming irate and yelling "[s]tay the fuck away from me" and "[d]on't mess with my money." Oct. 4, 2021 Hudson Statement, Ex. 78 at 2. After the call, both Dr. Hudson and Mr. Pryor attended an event at Dr. Martin Luther King, Jr. Early College. Dr. Hudson requested that DPS security escort her at the event. Their only interaction there was when Mr. Pryor greeted Dr. Hudson with an elbow bump. As they were leaving the event, however, Dr. Hudson and Mr. Pryor exchanged text messages, and Mr. Pryor demanded "to be at the table for EVERYTHING" related to the STEAM Academy. Hudson Text Messages, Ex. 80 at 2. Mr. Pryor wrote:

> "If retaliation comes from you, you will have a problem" is no threat..... IT IS A PROMISE..... That problem will be a legal one. You are no longer invited to work with me or our school. You have contributed nothing to this point so you have zero skin in the game so it should be easy for you to "step off" NOBODY WANTS YOU INVOLVED. So why would you want to be. Is it your it your [sic] ego or your hunger for control/ power trip? Either way you won't be working with us moving forward. I will see to it that your boss informs you expeditiously.

Hudson Text Messages, Ex. 80 at 6. Mr. Pryor ended the conversation with "Kiss my ass." *Id.* at 7. At that time, Dr. Hudson did not file a formal complaint with DPS based on Mr. Pryor's conduct.

**2021: Mendez and Hudson Complaints and Investigations**

In November 2020, the DPS Board concluded the STEAM Academy should be co-located with Montbello Career and Technical High School in an office building in Far Northeast Denver while the Board searched for a long-term facility placement. Nov. 19, 2020 Board Resolution, Ex. 14 at 1. The following February, the DPS school choice and enrollment process

began for the STEAM Academy. The DPS department in charge of that process misidentified the address of the school on the school choice application. As a result, when parents in Far Northeast Denver entered their addresses in the application, the STEAM Academy did not show up as a nearby option for enrollment. The DPS Executive Director of Enrollment and Campus Planning was Elizabeth Mendez. On February 16, 2021, during a meeting over Zoom, Mr. Pryor criticized Ms. Mendez and her team for their error, using "strong tone and language." June 2021 Investigation Rep., Ex. 58 at 3. The error was significant because it was the STEAM Academy's first year enrolling students, and its funding was to depend on the number of students who enrolled. After the February 16 Zoom meeting, parents notified Mr. Pryor that they had received calls from DPS employees questioning whether they wanted to enroll their children in the STEAM Academy. Mr. Pryor emailed Ms. Mendez about these reports, Feb. 19, 2021 Pryor Email, Ex. 15 at 1-2, but she did not respond, June 2021 Investigation Rep., Ex. 58 at 3. Mr. Pryor also used Facebook Live to highlight the mistakes of Ms. Mendez and her team. *Id.*

Ms. Mendez later reported that she believed Mr. Pryor had engaged in unprofessional conduct during the February 16 Zoom meeting. *Id.* at 1. DPS employee Dana Risch investigated Ms. Mendez's allegations and considered whether Mr. Pryor violated DPS's policies on nondiscrimination and equal opportunity. *Id.* DPS Policy AC states:

> Denver Public Schools . . . is committed to fostering, cultivating and preserving a culture of diversity, inclusion, belonging, and equity. [It] will work to provide a safe learning and working environment where all members of the school community are treated with dignity, decency, and respect.

Nondiscrimination Policy, Ex. 50 at 1. The procedures set out in DPS Regulation AC-R1 govern related "investigations of discrimination and harassment of a community member, student, employee, or applicant for employment" as relevant in this case. *Id.*; *see also* Regulation AC-R1, Ex. 51 at 1-6. Under Regulation AC-R1, harassment is considered a form of discrimination and

requires the unwanted conduct to be based on one's status as a member of a protected class. *Id.* at 2. Ms. Risch concluded that, while there was no evidence Mr. Pryor violated DPS policy by engaging in discriminatory conduct, his "behavior is not professional in nature" and "is inconsistent with the district's commitment to providing all employees to [sic] a respectful and inclusive work environment." June 2021 Investigation Rep., Ex. 58 at 4. Mr. Pryor was not interviewed during Ms. Risch's investigation because he is a community member and not a DPS employee. *Id.*

When Superintendent Marrero applied for his position with DPS, in the spring of 2021, Mr. Pryor backed another candidate and advocated against Superintendent Marrero because he was not from Denver and his past school district had only 11,000 students. Mr. Pryor called Board members and spoke out on Facebook. After Superintendent Marrero was selected by the Board, he reached out to Mr. Pryor. The two developed a working relationship, with Mr. Pryor becoming supportive of Superintendent Marrero for a period.

In the fall of 2021, the STEAM Academy began educating students. On its first day of classes, Mr. Pryor was prevented from entering the building based on COVID restrictions. Dr. Hudson had been told by her supervisor to ensure that COVID restrictions were being enforced at the STEAM Academy in particular, and so Dr. Hudson communicated that requirement to the school's principal, resulting in Mr. Pryor being unable to enter the building. Upset that his access was restricted, Mr. Pryor called Dr. Hudson and another heated conversation ensued.

Dr. Hudson later filed a formal complaint with DPS regarding that call and included her October 23, 2020 interactions with Mr. Pryor in the complaint. Nov. 2021 Investigation Rep., Ex. 56 at 3. Dr. Hudson believed Mr. Pryor had behaved in a threatening and harassing manner towards her on both occasions. *Id.* According to her complaint, Mr. Pryor stated during the

August 2021 call: "If you block or try to stop the work that I am doing or my money – if you have any part of my school, I am coming for you. You will no longer work in the district or have a job in DPS." Aug. 27, 2021 Hudson Rep, Ex. 75 at 1. Dr. Hudson also reported that Mr. Pryor had posted on Facebook that DPS needed to fire her. *Id.* And she later sent an email regarding a Facebook video by Mr. Pryor in which she was mentioned. Nov. 18, 2021 Hudson Email, Ex. 74 at 1. DPS hired an outside company to investigate Dr. Hudson's complaint, and David Vogel, a Senior Investigator for the company, performed the investigation. Nov. 2021 Investigation Rep., Ex. 56 at 1. Mr. Pryor gave a statement for Mr. Vogel's investigation and acknowledged that he had told Dr. Hudson to "[s]tay the fuck away from [his] school." Oct. 28, 2021 Pryor Statement, Ex. 6 at 3. Mr. Vogel's investigation concluded that Mr. Pryor had engaged in "hostile and abusive behavior" toward Dr. Hudson but had not violated DPS Policies AC or AC-R1 on harassment. *Id.* at 3-4.

On January 13, 2022, DPS Deputy General Counsel Brent Jordheim sent Mr. Pryor a letter about the findings of Mr. Vogel's outside investigation and informed Mr. Pryor of DPS's decision to limit his access to the STEAM Academy. Jordheim Letter, Ex. 59 at 1-2. According to the letter, Mr. Pryor was to have the same access to the school as any other community member and would be required to have advance approval from the principal for any visit. *Id.* at 2. That restriction was to remain in place until it was revoked or superseded in writing. *Id.* at 3. However, Mr. Pryor did not receive Mr. Jordheim's letter and his access to the STEAM Academy was never restricted based on that letter.

**2022: Brown Complaint, Lynch Complaint and Investigation, and Mr. Pryor's Advocacy**

In 2021, DPS voted to reopen Montbello High School and hired Neisa Lynch as its principal. Ms. Lynch was tasked with hiring all staff for the school. Ms. Lynch chose Damian Brown as the school's athletic director. For the Montbello football team, she selected another coach over Coach Lindsay of the Far Northeast Warriors. She also did not invite the nationally recognized librarian of the Montbello campus to return. Mr. Pryor posted about Ms. Lynch's hiring decisions on Facebook. Pryor Facebook Posts, Ex. 1 at 12-15. Ms. Lynch "expressed concern through email to District leaders" afterwards. Sept. 2022 Investigation Rep., Ex. 60 at 4.

In February 2022, Mr. Pryor posted on Facebook that Ms. Lynch, Mr. Brown, and the new football coach "ALL NEED TO BE FIRED ASAP." Pryor Facebook Posts, Ex. 1 at 17. In response to Mr. Pryor's Facebook posts, Mr. Brown filed a formal complaint with DPS stating "Mr. Pryor has been on social media harassing the staff of Montbello High School, calling for them to be fired and telling community not to enroll in the school." Brown Complaint, Ex. 86 at 1.

Deputy Smith started in his position in July 2022. Superintendent Marrero then began referring Mr. Pryor to Deputy Smith, who was friends with both Ms. Lynch and Mr. Brown. Mr. Pryor believed cronyism would prevent Deputy Smith from fairly considering his complaints and was frustrated by Superintendent Marrero's delegation.

In August 2022, the Far Northeast Warriors junior varsity ("JV") football team was scheduled to play Westminster High School. A representative for the football officials sent an email to the Westminster athletic director and Damian Brown informing them that he was having trouble scheduling officials for the upcoming game. Football Game Emails, Ex. 92 at 1. Although the representative specifically noted that he had the game originally scheduled as a Far

Northeast home game, *id.* at 4, Mr. Brown did not reach out to anyone in the Far Northeast Warriors program or direct the officials to do so, *id.* at 5. As a result, Westminster High School's JV football team played Montbello's freshman team and did not to show up for its game against the Far Northeast Warriors. No action was taken by DPS against any Montbello High School staff member to remedy the situation. Mr. Pryor used his Facebook page to inform the community about this incident, including specific posts about Mr. Brown, Ms. Lynch, and her husband, an employee at Westminster Public Schools. Pryor Facebook Posts, Ex. 1 at 1, 18-19, 29.

Around this same time, Mr. Pryor began noticing how the office building where the STEAM Academy was located was inadequate as a school facility. Mr. Pryor raised his concerns with Deputy Smith, who advised Mr. Pryor that the STEAM Academy should satisfy certain criteria if it wanted to grow and obtain a new facility. These criteria were not enumerated in the 2020 resolution passed by the Board stating that it would continue to search for a long-term facility for the STEAM Academy. *See* Nov. 19, 2020 Board Resolution, Ex. 14 at 2.

In September 2022, Mr. Pryor appeared in the news discussing the inadequacies of the STEAM Academy's facilities, including how students were not provided with a hot lunch. DPS's Deputy Superintendent of Operations, James Carpenter, appeared in the same news segment. Mr. Pryor later condemned Mr. Carpenter on Facebook for his comments in the segment.

Mr. Pryor also made a series of Facebook posts criticizing DPS, Superintendent Marrero, Deputy Smith, and others. Specifically, he discussed DPS's actions in:

- Failing to provide appropriate facilities for the STEAM Academy, Pryor Facebook Posts, Ex. 1 at 28;

- Trademarking the Know Justice Know Peace podcast created by Black female students at DPS, *id.* at 26;

- Placing a disproportionate number of Black male students in affective needs centers, *id.* at 22; and

- Discriminating against Black students and educators in other ways, *id.* at 21-23, 27.

Citing Mr. Pryor's Facebook posts, Ms. Lynch complained to DPS that Mr. Pryor had subjected her to harassment, defamation, and slander and that he had intimidated and threatened her and her husband. Sept. 2022 Investigation Rep., Ex. 60 at 2. Ms. Lynch's allegations were investigated by Ms. Risch. *Id.* at 5. The related Investigation Report includes the following section describing Mr. Pryor's Facebook posts:

> December 6, 2021: "What would you say if you knew Montebello's new principal is making Coach Lindsay interview for his job? Complete disrespect!" "Watch out for the Black folks trying to Whitesplain this bullshit," was an additional comment the Respondent made in this Facebook thread.
>
> December 7, 2021: "Warning! Don't poke a resting bear!"
>
> December 9, 2021: In a post regarding Janet Rene Damon, nationally recognized librarian who was not asked to return to Montbello. "Benny A. Samuels, Neisa Lynch and her leadership team are a disgrace to the entire community."
>
> December 14, 2021: "Where were you while we frontline for Montbello Neisa Lynch, Chris Warren, Stanley Richardson and Damian Brown."
>
> December 17, 2021: "Neisa Lynch, Damian Brown, Crhis [sic] Warren and Kevin Wilson decided to hire Stanley Richardson to be Montbello's new head football coach over the legendary coach Tony Lindsay..chime in."
>
> December 29, 2021: "Wrong is wrong! We are calling for Neisa Lynch, Damian Brown, Chris Warren and Kevin Wilson to resign."
>
> January 4, 2022: "Neisa Lynch, Damian Brown, Chris Warren and Kevin Wilson..Ya'll owe the community an explanation ASAP and you all need to resign."
>
> February 1, 2022: Neisa Lynch, Chris Warren, Damian Brown, Kevin Wilson and Stanley Richardson all need to be fired ASAP and don't enroll your kids at Montbellow [sic] until they are gone!"
>
> April 17, 2022: "The entire leadership team at Montbello needs to be fired. More harm to our community. DPS leadership is responsible as well. There is no justifiable reason for handling this situation this way. P.S. We refuse to accept this continued

mistreatment of our community. Get ready!"

September 19, 2022: "What are the chances that Neisa Lynch and her husband Mike Lynch worked together to steal our kids game? And what are the chances that Westminster didn't know the difference between FNE Warriors and Montbello Warriors? I'm sure they've talked about it all. He's in Westminster public schools. Westminster only has one MS and one HS with a team. Westminster absolutely would have known about FNE unless spouses don't talk." This post contained a picture of Mr. Lynch's LinkedIn profile picture and credentials.

\* \* \*

September 16, 2022: "Ok DPS, I have been quiet for too long. Time to expose this DPS mess! I will be going live this morning and will be on the Brotha Jeff Show at 2 p.m. Tune in."

September 16, 2022: "DPS second in charge, Tony Smith, is the biggest sellout and snake in DPS! He needs to be fired ASAP!"

September 27, 2022: "DPS Deputy Superintendent of Operations Jim Carpenter should have to eat the lukewarm reheated lunch he feels is ok to feel [sic] our children. And he should have to eat it daily for a year and a semester, or however long you've subjected our kids to this horrible condition. P.S. You looked and sounded like a flagrant racist on News 4 the other day. I hope the DPS continues to let you do these interviews Jim because ignorance, inequity and flagrant racism is on display when you speak."

September 28, 2022: "Look at this BS. DPS had a Lunch and Learn session yesterday. Listening to Alex Marrero tell stories is what they are considering "professional Development." All while he sits in front of a bold face lie. The DPS Core Values. I wonder if the lunch was prepared off site and then delivered lukewarm."

*Id.* at 2-4. Ms. Lynch did not allege that she has had any inappropriate in-person contact with Mr. Pryor, and when asked at the hearing to point to the threats in Mr. Pryor's Facebook posts, she identified only the post about her husband and said that it was threatening to his career and his reputation as an educator. Lynch Testimony (Dec. 8, 2022). Mr. Pryor was interviewed as a part of Ms. Risch's investigation this time around, and he explained that he felt there was "no accountability but meanwhile everyone is tracking to see what [he] is doing wrong." Sept. 2022 Investigation Rep., Ex. 60 at 4. Based on the Facebook posts, Ms. Risch found Ms. Lynch's "allegations of harassment to be credible in nature." *Id.* at 5. Ms. Risch concluded Mr. Pryor's

conduct was "inconsistent with the District's commitment to providing all employees to [sic] a respectful and inclusive work environment." *Id.* at 5.

On October 12, 2022, Mr. Pryor attended a Board work session at which DPS employees presented on the proposal to close the Montbello Career and Technical High School to provide more space for the STEAM Academy in their shared building. *See* Oct. 12, 2022 Board Meeting Slides, Ex. 8 at 6. Following the meeting, Mr. Pryor confronted Mr. Carpenter and Ms. Mendez in the elevator lobby and expressed his frustration with the plan and DPS's continued failure to provide the STEAM Academy with a long-term school facility. Mr. Pryor had not seen Ms. Mendez since the February 2021 Zoom meeting. Pryor Testimony (Dec. 6, 2022). He again stated that she should be fired and that Mr. Carpenter's tone on the news piece was racist. *Id.* During their conversation, a DPS security guard stood next to Mr. Pryor as he spoke. Oct. 12, 2022 Video, Ex. 9. Mr. Pryor spoke passionately and used his hands. *Id.* But Ms. Mendez and Mr. Carpenter stayed and listened, and both testified at the hearing that they did not feel threatened. Mendez Testimony (Dec. 15, 2022); Carpenter Testimony (Dec. 14, 2022). Mr. Carpenter asked Mr. Pryor during the encounter why Mr. Pryor came in there and "attack[ed]" them. Pryor Testimony (Dec. 6, 2022). Mr. Pryor explained that the word attack is a specific word white folks like to use in describing Black people who are trying to have a conversation and, as he left the building, he remarked "kiss my ass" to Mr. Carpenter. *Id.*

On October 17, 2022, Mr. Pryor and a group of activists appeared at DPS headquarters for a Board public comment session. *See* Oct. 17, 2022 Public Comment List, Ex. 10 at 1-4. The group raised concerns about DPS's trademark of the Know Justice, Know Peace podcast; the closing of the American Indian Academy of Denver; DPS's failure to find a long-term facility for the STEAM Academy; and its recommendation to close Montbello Career and Technical

High School. *Id.* The following day, Superintendent Marrero issued a DPS Community Update responding to the concerns raised at the public comment session the day before. Oct. 18, 2022 DPS Community Update, Ex. 4 at 1-4.

**October 18, 2022 Letter**

That same day, October 18, 2022, DPS General Counsel Aaron Thompson wrote Mr. Pryor a letter (the "Thompson Letter"), describing Mr. Pryor's "pattern of threatening and bullying behavior" and imposing restrictions on his access to DPS facilities and his relationship with DPS. Thompson Letter, Ex. 61 at 1, 7. Mr. Thompson testified that the formal complaint by Ms. Lynch and resulting Investigation Report were the "catalyst" for and part of the reasoning behind his letter. Thompson Testimony (Dec. 9 & 14, 2022). The decision to impose the new restrictions was ultimately made by Superintendent Marrero. Marrero Testimony (Dec. 9, 2022). Deputy Smith was also involved in the decision-making process. Smith Testimony (Dec. 8, 2022). The letter was served on Mr. Pryor at his home on October 19, 2022.

The Thompson Letter claims Mr. Pryor violated DPS Policies KFA, KI, and G, but it does not discuss these policies. Thompson Letter, Ex. 61 at 1. The relevant provisions of DPS Policy KFA are set out above.[3] To implement Policy KFA, DPS Regulation KFA-R was developed. *See* Regulation KFA-R, Ex. 54 at 1. Regulation KFA-R specifies that "[u]nder no circumstances should letters of restriction to schools be used in place of conflict resolution or to

---

[3] Mr. Pryor contends that Policy KFA does not apply to the Thompson Letter because the letter does not allege that he engaged in any conduct while on school property. Reply to Mot. for Preliminary Injunction at 6, ECF No. 25. Dr. Hudson's phone call and text messages with Mr. Pryor were the only incidents Defendants highlighted as occurring on school property, but it was not established that Mr. Pryor was on school property during either exchange.

retaliate against a parent/legal guardian." *Id.* at 1. The second policy DPS claims Mr. Pryor violated—Policy KI—informs that:

> Visiting a school is a privilege, not a right, which may be limited, denied or revoked by a school administrator or designee based on considerations of student and /or staff safety, efficient school operations, maintenance of a proper educational environment, or failure to comply with th[e] policy.

Policy KI, Ex. 55 at 1. The third policy referenced in the Thompson Letter—Policy G—is not mentioned in Defendants' Response and was not provided as an exhibit.[4]

The Thompson Letter recounts the allegations of Ms. Lynch, Dr. Hudson, and Ms. Mendez regarding Mr. Pryor.[5] Thompson Letter, Ex. 61 at 2-7. It begins with Ms. Lynch's complaints and includes the same Facebook posts set out above from the related Investigation Report. *Id.* at 2-3. The letter repeatedly references Facebook posts by Mr. Pryor and videos in which he appeared. *Id.* at 2-4. Although it is not mentioned in the text, attached to the letter is a screenshot of Mr. Pryor's Facebook messages with a community member, in which Mr. Pryor stated:

- "WHEN I SEE YOU YOU ARE GOING TO HAVE A PROBLEM";
- "If you think it's a threat. Report it to police. Its a promise";
- "We will see if you have the courage to call me a sellout to my face"; and
- "Send address and I can come now."

Yollick Messages, Ex. 67 at 1.

Mr. Thompson testified that he also considered other email complaints received by DPS employees that are not mentioned in the letter. Thompson Testimony (Dec. 14, 2022). In October

---

[4] In their Response to the Motion for Preliminary Injunction, Defendants also mention Policy GBGB, but that policy relates to the personal safety and security of DPS employees and specifically the procedure to follow when it is alleged that a student's conduct has infringed on an employee's safety. Policy GBGB, Ex. 52 at 1. It is therefore irrelevant.

[5] The Thompson Letter does not discuss the 2019 incident that resulted in Mr. Pryor being restricted from his son's school.

2021, a parent emailed the Commissioner of the Colorado High School Activities Association mentioning Mr. Pryor's purported felony convictions and claiming that Mr. Pryor was cursing in front of students. Wiley Email, Ex. 72 at 1.[6] In April 2022, a "concerned DPS parent" emailed the principal of the STEAM Academy, copying Dr. Hudson and Superintendent Marrero, claiming that Mr. Pryor was making threats on the Internet and referring to people as "white girl" and "white boy." Liberty Email Chain, Ex. 97 at 2. Dr. Hudson forwarded this email to DPS's former General Counsel, among others, asserting that Mr. Pryor "ha[d] clearly threatened harm to this parent," even though no such threat was reported in the email of the "concerned DPS parent." *Id.*

The Thompson Letter prohibited Mr. Pryor from attending DPS Board meetings or public comment sessions in person and banned him from DPS property, except during public events and in his capacity as a parent. Thompson Letter, Ex. 61 at 1, 7. The letter advises: "[Y]ou are hereby prohibited from entering or remaining on any District property (except as noted in the following paragraph)." *Id.* at 1. The next paragraph states: "The only exception to the complete and total ban from District properties is to access, in your capacity as a parent, the campuses of: [the schools of Mr. Pryor's children]; and to attend events open to the general public." *Id.* Contrary to these explicit terms and the testimony of Superintendent Marrero, Marrero Testimony (Dec. 9, 2022), Mr. Thompson testified that Mr. Pryor could access DPS property as any member of the public could, including visiting DPS facilities with advance permission. Thompson Testimony (Dec. 14, 2022).

The Thompson Letter also terminated Mr. Pryor as a DPS coach and prohibits him from volunteering for DPS in any capacity. *Id.* at 1, 7. The letter states that Mr. Pryor's criminal

---

[6] The parent wrote that the same concerns were also being emailed to Dr. Hudson specifically. Wiley Email, Ex. 72 at 1.

history, including his misdemeanor assault charges in Colorado and "felony convictions in Texas," make him ineligible for volunteer and coaching opportunities, and new DPS leadership had determined to no longer allow him an exception. *Id.* at 6. Mr. Pryor's Texas felony case, resulted in no conviction, however. Texas Court Rec., Ex. 65 at 1 (documenting that the disposition on the charges was "deferred adjudication").

Finally, the Thompson Letter informed Mr. Pryor that he could file an appeal within 30 days. Thompson Letter, Ex. 61 at 7. Mr. Pryor did so on October 26, 2022, raising many of the arguments he advances in this case. *See* Appeal of Thompson Letter, Ex. 62 at 1-14. Six days after this case was filed, DPS Deputy Chief of Staff, Deborah Staten, responded to Mr. Pryor's appeal, removing the restrictions on his attendance at DPS Board meetings and his participation in public comment sessions in person. Staten Response, Ex. 63 at 2.

In addition to the Thompson Letter, DPS sent an email to parents and students at the STEAM Academy notifying them that Mr. Pryor would no longer be allowed to access the building as a school founder. Oct. 20, 2022 DPS Email, Ex. 3 at 1-2. The email stated:

> All of us are expected to maintain an atmosphere that ensures the learning and safety of all District students, families, and educators. We expect all individuals who come onto school property or who contact school employees to behave accordingly. As some of you may be aware, there have been repeated situations involving one of our community members, Brandon Pryor, failing to meet this basic expectation.

*Id.* at 1.

**Proceedings in This Case**

Mr. Pryor filed this case on November 3, 2022. He asserts three claims in his Complaint: His first claim is brought against Superintendent Marrero and Deputy Smith under 42 U.S.C. § 1983 and 1985 and alleges they retaliated against him in violation of the First Amendment to the

U.S. Constitution. Compl. ¶¶ 78-81, ECF No. 1. Mr. Pryor's second claim is asserted against

DPS under § 1983 for its alleged failure to properly train and supervise Superintendent Marrero

and Deputy Smith. *Id.* ¶¶ 83-89. Mr. Pryor's final claim contends all Defendants violated and

continue to violate Mr. Pryor's right to freedom of speech under Article II, Section 10, of the

Colorado Constitution. *Id.* ¶¶ 91-92.

Mr. Pryor's Motion for Preliminary Injunction pertains only to his first claim. The

Motion requests that the Court issue his Proposed Order (ECF No. 4-1), which would enjoin

DPS and others acting in concert with it from:

> (a) banning Mr. Pryor from DPS property (including the Robert F. Smith STEAM
> Academy . . .), public comment, coaching, volunteering, and otherwise freely
> participating in DPS events and activities; and (b) otherwise restraining,
> prohibiting, or suppressing Mr. Pryor or any other person within DPS from
> exercising free speech . . . .

Proposed Order at 2, ECF No. 4-1. The Proposed Order would additionally require DPS to

restore Mr. Pryor's ability to coach and to access the STEAM Academy as a school founder. *Id.*

And, more broadly, the Proposed Order would mandate that Defendants:

> take such affirmative steps necessary to remediate the past restraints on Mr. Pryor's
> expression, including, but not limited to, preparing and publishing a statement
> announcing to the public, and especially to the parents and families of the STEAM
> Academy, that Defendants erroneously issued the ban on Mr. Pryor and that
> Defendants have rescinded the ban effective immediately.

*Id.*

## II. PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

*v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 24 (2008). When presented with a motion for a

preliminary injunction, courts in the Tenth Circuit consider whether: (1) the movant is

substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the threatened injury to the movant outweighs the injury facing the opposing party under the injunction; and (4) the injunction is adverse to the public interest. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). It is the movant's burden to establish by a preponderance of the evidence that these factors weigh in favor of an injunction. *Citizens Concerned for Separation of Church & State v. City of Denver*, 628 F.2d 1289, 1299 (10th Cir. 1980).

## III.  ANALYSIS

### A. Likelihood of Success on the Merits

Mr. Pryor's Motion for Preliminary Injunction argues only that he is likely to succeed on his first claim, which is brought pursuant to 42 U.S.C. § 1983. That statute provides that every person who, acting under the color of law, deprives another "of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . .." 42 U.S.C. § 1983. Mr. Pryor alleges that Superintendent Marrero and Deputy Smith have violated his constitutional rights by retaliating against him for exercising his right to free speech under the First Amendment to the U.S. Constitution. The First Amendment prohibits Congress from making any law "abridging the freedom of speech." U.S. Const. amend. I. This prohibition is applied to the states through the Fourteenth Amendment. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964). First Amendment claims are considered "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270.

My analysis of Mr. Pryor's First Amendment retaliation claim centers on Ms. Lynch's complaint and Mr. Pryor's related Facebook posts. Her complaint was the "catalyst" for the Thompson Letter and is indisputably based on the content of Mr. Pryor's speech. Thompson Testimony (Dec. 9 & 14, 2022); Thompson Letter, Ex. 61 at 2-4. That speech involved the job performance of DPS employees and ways Mr. Pryor believed DPS was failing its students.

### 1. Applicable Standard

Generally, to succeed on a First Amendment retaliation claim, a plaintiff who is neither a government employee nor contractor must show: (1) that he "was engaged in constitutionally protected activity"; (2) that the defendants' actions caused him "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) that the defendants' "adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (internal quotation marks and citation omitted). Speech by public employees is less protected. "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). The test for First Amendment retaliation claims brought by government employees is derived from *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), and *Garcetti v. Ceballos*. It requires consideration of:

> (1) whether the [employee's] speech was made pursuant to [his] official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Rock v. Levinski*, 791 F.3d 1215, 1219 (10th Cir. 2015) (internal quotation marks and citation omitted). Essentially, "the government may not punish the speech of public employees if it involves matters of public concern unless the state can prove that the needs of the government outweigh the speech rights of the employee." Erwin Chemerinsky, *Constitutional Law* § 11.3.8.1 (6th ed. 2019).

Defendants contend that, because Mr. Pryor was a DPS volunteer, the proper standard for his retaliation claim is the *Garcetti/Pickering* test applicable to government employees. Mr. Pryor disagrees and instead uses the general standard from *Worrell*, emphasizing that he is neither a government employee nor contractor. Defendants broadly claim that "[v]olunteers for public entities are . . . subject to the *Garcetti/Pick[er]ing* analysis." Resp. at 15 (emphasis removed). Defendants do not differentiate between the countless types of volunteers, but they cannot mean that *all* DPS volunteers (and all public volunteers generally) must accept limitations on their free speech rights.[7] Because Defendants do not sufficiently explain why Mr. Pryor's unique relationship with DPS justifies limitations on his speech rights, I find Mr. Pryor is correct that his claim should not be analyzed as if he were a DPS employee.

The cases cited by Defendants do not persuade me otherwise. In *Andersen v. McCotter*, the Tenth Circuit evaluated the First Amendment retaliation claim of a "paid volunteer" under the *Garcetti/Pickering* test, but it found that the plaintiff "was not a volunteer—she was obviously a government employee." 100 F.3d 723, 726-27 (10th Cir. 1996). The court did not state that the same analysis would apply to the claim of an unpaid volunteer. It commented that even an unpaid volunteer is entitled to First Amendment protection. *Id.* at 727. Likewise, the plaintiff in *Cooper v. Town of Bar Nunn, WY*, was a public employee (a fireman), 101 Fed.

---

[7] Significantly, the record does not show that Defendants provide any sort of notice to DPS volunteers that they must accept limitations on their free speech rights as DPS employees must.

Appx. 324, 325 (10th Cir. 2004), so that case does not support application of the standard for First Amendment retaliation claims brought by government employees to Mr. Pryor, a volunteer.

Nevertheless, I find the result is the same applying either the *Worrell* or the *Garcetti/Pickering* standard: Mr. Pryor is likely to succeed on the merits of his First Amendment retaliation claim. Considering the extraordinary remedy sought, I apply the more stringent standard preferred by Defendants for the purposes of this Order.

### 2. Speech Pursuant to Official Duties

The first two considerations of the *Garcetti/Pickering* test are whether the employee's speech was made pursuant to his official duties and whether the speech was on a matter of public concern. Defendants combine and conflate these two inquiries, arguing that Mr. Pryor's speech related to his position as a volunteer football coach and as a founder of the STEAM Academy and so is not protected. Resp. at 18; Defs.' Counsel Argument (Dec. 19, 2022). *Garcetti* made clear that the two steps are separate. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 n.4 (10th Cir. 2007).

Defendants have not presented any evidence on Mr. Pryor's duties and responsibilities as a volunteer coach or school founder. While Mr. Pryor presumably had some DPS sanctioned duties as a volunteer coach, there is no indication that Mr. Pryor's continuing activities as a founder of the STEAM Academy were prescribed by DPS. Deputy Smith stressed during his testimony that Mr. Pryor was not a DPS employee and that, as a mere school founder, Mr. Pryor could not "operationalize" on the District's behalf. Smith Testimony (Dec. 8, 2022); *see also* Jordheim Letter, Ex. 59 at 1 ("You are currently not employed by DPS nor do you have authority over the operations of Smith STEAM Academy."). Nothing in the record supports the conclusion

that Mr. Pryor's speech at issue in this case was made pursuant to any official duties he had as a DPS volunteer.

### 3. Speech on Matters of Public Concern

At the second step of the *Garcetti/Pickering* test, Mr. Pryor must establish that his relevant speech was on matters of public concern, which "are those of interest to the community, whether for social, political, or other reasons." *Brammer-Hoelter*, 492 F.3d at 1205 (internal quotation marks and citation omitted). Courts "focus on the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest." *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000). "Statements revealing official impropriety usually involve matters of public concern." *Brammer-Hoelter*, 492 F.3d at 1205 (citation omitted).

Defendants fault Mr. Pryor for failing to point to his precise speech that is protected. Defendants' contention is shortsighted. The Thompson Letter itself includes Mr. Pryor's Facebook posts that formed the basis of Ms. Lynch's complaint.[8] Thompson Letter, Ex. 61 at 2-3. These posts discuss the hiring of school staff, the perceived need for school employees to resign or be terminated, the possibility that a school football team had their game purposefully stolen, the inadequacy of the STEAM Academy's facility, and other sensed mistreatment of the community. *Id.* Mr. Pryor's speech undoubtedly involves matters of public concern because it

---

[8] Mr. Pryor also submitted documentary evidence of his emails and Facebook posts, and he testified at the hearing regarding his advocacy over the course of the past five years, including at public comment sessions held by the Board.

was directed at revealing official shortcomings in the public school system and pushing administrators to do better.[9]

### 4. Balancing of Interests

The third step of the *Garcetti/Pickering* test requires me to balance DPS's interest as an employer with Mr. Pryor's free speech interests. DPS bears the burden of justifying its need to regulate Mr. Pryor's speech. *Brammer-Hoelter*, 492 F.3d at 1207. Relevant to this analysis is whether Mr. Pryor's speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Defendants assert that "DPS has a legitimate governmental interest in maintaining a safe and secure environment for its employees which overrides any limited impact on Plaintiff's First Amendment interests resulting from the restrictions." Resp. at 3.

School employees deserve to feel safe and secure in their workplaces, and there is no doubt that a lack of security could impact the performance of their duties. Still, they are public employees whose actions are matters of public concern, and as public servants, they cannot be insulated from criticism related to their employment. In the age of the Internet, this criticism may feel more penetrating and pervasive.[10]

---

[9] Although I find that this speech involves matters of public concern, not all of Mr. Pryor's speech presented in this case would fall under the umbrella of protected speech.

[10] Public employees may be on high alert because of the increased harassment of election officials, particularly on social media. *See, e.g.*, Linda So, Peter Eisler, & Jason Szep, *'Kill them': Arizona election workers face midterm threats*, Reuters (Nov. 6, 2022), https://www.reuters.com/world/us/kill-them-arizona-election-workers-face-midterm-threats-2022-11-06/. Out of necessity, Colorado recently passed a law protecting election officials and prohibiting individuals from posting on the Internet election officials' personal information,

Nevertheless, Mr. Pryor's speech associated with Ms. Lynch's complaint did not endanger the safety or security of DPS employees. As Ms. Lynch testified, Mr. Pryor's speech could only be construed as threatening the jobs of public employees. Lynch Testimony (Dec. 8, 2022). It goes without saying that speech aimed at schools and their employees could be threatening, but Mr. Pryor's implicated speech did not cross into that territory.[11] *Cf. Davison v. Rose*, 19 F.4th 626, 631, 637 (4th Cir. 2021) (emphasizing that the plaintiff "'made allusions to American Sniper,' said 'SHOTGUN' and 'BE PREPARED' in reference to public meetings, called a public school a 'target rich environment,' and 'made a reference to public officials meeting their creator,' among other concerning statements").

An "employer's interest in regulating an employee's speech varies 'with the extent of authority and public accountability the employee's role entails.'" *Trant v. Oklahoma*, 754 F.3d 1158, 1166 (10th Cir. 2014) (quoting *Rankin*, 483 U.S. at 490). As discussed above, Defendants have not presented any evidence on the extent of Mr. Pryor's authority or his public accountability as a volunteer. Thus, there is no evidence that Mr. Pryor's Facebook posts impeded the performance of his own duties. The record also does not show that Ms. Lynch and Mr. Pryor were required to work together. In fact, Ms. Lynch testified that she had never had an in-person conversation with Mr. Pryor and had not seen him in over a year. Lynch Testimony (Dec. 8, 2022). DPS must have been aware that Mr. Pryor is employed elsewhere in a position that involves advocacy. Likewise, it must have been aware of his history of activism targeted at the District. It could not, therefore, simply assume Mr. Pryor would be silent on DPS-related

_____

including their photos. An Act Concerning Protections for Election Officials, 2022 Colo. Legis. Serv. Ch. 324 (H.B. 22-1273) (June 2, 2022).

[11] At least one of Mr. Pryor's Facebook posts included images of DPS students that may have been used without obtaining proper permission. DPS's interest in safeguarding its students is paramount. However, Defendants did not develop any argument related to the use of student images.

matters as a District volunteer.

Further, the perception of and comments about Mr. Pryor's conduct must be viewed in context. A theme of Defendants' case is Mr. Pryor's failure to act with "civility" and "professionalism." *See, e.g.*, Defs.' Counsel Cross-examination of Mr. Pryor (Dec. 7, 2022). These accusations are necessarily met with skepticism, as standards of "civility" and "professionalism" have been used as tools of discrimination and to silence opposition. *See, e.g.*, Lynn Mie Itagaki, *The Long Con of Civility*, 52 Conn. L. Rev. 1169, 1171–72 (2021) ("We should be deeply suspicious with demands for civility that are often deployed to quell dissent from marginalized populations and to dampen democratic practices."); Leah Goodridge, *Professionalism as a Racial Construct*, 69 UCLA L. Rev. Discourse 38 (2022). Defendants seek to preserve the "tranquility" of DPS. *See* Resp. at 19, 24. In short, their focus in these proceedings is on the absence of tension, not the presence of justice.[12]

Mr. Thompson made clear that DPS's desire to maintain a "safe and secure environment" for its employees is based on its interest in avoiding liability. Thompson Testimony (Dec. 9, 2022). During his testimony, he did not mention contemplating First Amendment rights or their value when writing his letter. Additionally, much of the hearing testimony was directed at the correctness of Mr. Pryor's views. The ultimate concern, however, is not whether Mr. Pryor was misguided in his advocacy, but rather the permissible limits of his public expression.

---

[12] This narrow focus brings to mind the words of Dr. Martin Luther King, Jr., discussing the white moderate:

> who is more devoted to order than to justice; who prefers a negative peace which is the absence of tension to a positive peace which is the presence of justice; who constantly says, "I agree with you in the goal you seek, but I can't agree with your methods of direct action" . . . .

Dr. Martin Luther King, Jr., Letter from Birmingham Jail (Apr. 16, 1963).

Defendants' improper emphasis illustrates their misunderstanding of the First Amendment and of the interplay between DPS's various legal obligations.

Defendants' arguments on the importance of DPS's interest ring hollow. Defendants contend that the restrictions placed on Mr. Pryor are designed to prevent his "threatening" conduct. According to Ms. Lynch's complaint, however, Mr. Pryor's "threatening" conduct was his speech on Facebook, and as Defendants recognize, the restrictions in the Thompson Letter do not prevent Mr. Pryor from posting on Facebook. Defendants could have taken many other actions to protect its employees and to prevent any interference with DPS operations. Most apparently, Defendants could have enforced the restriction on Mr. Pryor in the January 2022 letter from Mr. Jordheim. Defendants could have also explicitly defined the roles of school founders, set clear expectations for volunteer coaches, or engaged in mediation with Mr. Pryor. The record does not show that Defendants made these or any similar efforts. As a result, it is difficult to conclude that DPS's interest in regulating Mr. Pryor's speech is as significant as Defendants claim.

On the other hand, Mr. Pryor's free speech interest is weighty. "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks and citation omitted). Mr. Pryor is fighting to end DPS's long history of discrimination. His Facebook posts advocated for DPS students and for changes he thought would lead to progress.

Defendants stress that Mr. Pryor has no right to be on DPS property. That may be true, *see O'Connor v. Bassoff*, 15-cv-02121-GPG, 2015 WL 7774287, at *4 (D. Colo. Dec. 3, 2015), but Defendants still may not deny Mr. Pryor a benefit based on his protected speech, *see Seamons*, 84 F.3d at 1236.

Defendants further insist Mr. Pryor has other avenues for speaking out, including through Facebook content. As Mr. Pryor explains, though, Defendants used his Facebook posts as a justification for imposing the restrictions on him. Thompson Letter, Ex. 61 at 2-3. The Thompson Letter makes no effort to distinguish between protected speech and other content in Mr. Pryor's Facebook posts, giving the impression that Mr. Pryor could face consequences for any post related to DPS. So, while DPS has not directly limited Mr. Pryor's Facebook speech, it has impeded that avenue of expression.

Defendants have not shown that DPS's interests as an employer in relation to Ms. Lynch's complaint outweigh Mr. Pryor's free speech interests. DPS is not left without legitimate remedies to protect its interests and address the conduct of Mr. Pryor and that of other community members, parents, and volunteers. But clumsy and imperious actions that violate the rights of expression under the First Amendment are not permissible.

### 5. Motivating Factor in Imposing the Restrictions

At the fourth step of the *Garcetti/Pickering* test, Mr. Pryor must show that his speech "was a motivating factor in an adverse employment action." *Brammer-Hoelter*, 492 F.3d at 1207. There can be little doubt that is the case based on the present record. The Thompson Letter includes Mr. Pryor's Facebook posts that contain speech on matters of public concern and relies on those posts to impose the new restrictions on Mr. Pryor. Additionally, Mr. Thompson testified that Ms. Lynch's complaint regarding Mr. Pryor's Facebook activity was the "catalyst" for his letter. Thompson Testimony (Dec. 9 & 14, 2022).

### 6. Defendants' Alternative Reasoning

Since it is likely Mr. Pryor's protected speech was a motivating factor in DPS's decision to impose restrictions on him, the burden shifts to Defendants, "who must show by a preponderance of the evidence [they] would have reached the same employment decision in the absence of the protected activity." *Trant*, 754 F.3d at 1167 (citation omitted). Defendants have failed to make this showing.

Again, Mr. Thompson stated multiple times in his testimony that the complaint by Ms. Lynch based on Mr. Pryor's Facebook posts was the "catalyst" for imposing the broad restrictions on Mr. Pryor in October 2022. Thompson Testimony (Dec. 9 & 14, 2022). Except for Mr. Pryor's Facebook posts and his confrontation with Ms. Mendez and Mr. Carpenter, his other conduct described in the Thompson Letter all occurred before Mr. Jordheim wrote his restriction letter in January 2022. If Defendants would have imposed the current restrictions in the absence of Mr. Pryor's protected speech, why did they not do so with Mr. Jordheim's letter in January? Defendants do not answer this question.

The Thompson Letter explains that Mr. Pryor's relationship with DPS as a volunteer coach is being terminated because "new District leadership in several key departments" suddenly determined that his criminal history was unacceptable. Yet, DPS had known about Mr. Pryor's criminal history for years, and the two complaints related to Mr. Pryor's coaching were received by the District months before the Thompson Letter was drafted. In fact, in April 2022, after receiving the second complaint, DPS's former General Counsel advised:

> On top of the previous history related to [Mr. Pryor] (criminal charge for punching a stranger in the face who spit on him, his treatment of Dr. Antionette Hudson, and other complaints by largely female employees), we have plenty of information to deny a future application as a volunteer coach.

Liberty Email Chain, Ex. 97 at 1. But no action was taken at that time or before October 18,

2022. Instead, Defendants restricted Mr. Pryor from volunteering after Ms. Lynch filed her complaint regarding his Facebook posts in September 2022.

The timing strongly suggests the restrictions in the Thompson Letter are a consequence of Mr. Pryor's Facebook posts containing speech on matters of public concern. Defendants have not shown that they would have taken the same action without that speech.

Thus, I find, based on the present record and the arguments presented by the parties, that Mr. Pryor is likely to succeed on the merits of his First Amendment retaliation claim. I conclude only that the restrictions contained in the Thompson Letter are likely the result of improper retaliation.

## B. Irreparable Injury to Mr. Pryor

The remaining three inquiries of the preliminary injunction standard track whether Mr. Pryor's First Amendment retaliation claim is likely to succeed on the merits. Mr. Pryor argues that he is being irreparably harmed by Defendants' infringement on his First Amendment rights. He testified that he has been reluctant to speak out and is concerned about what other retaliation may follow. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). In support of their argument that Mr. Pryor has not shown irreparable harm, Defendants cite *Schrier v. University of Colorado*, but in that case, the court found the plaintiff was "not entitled to a presumption of irreparable injury" because he had failed to demonstrate he was likely to succeed on his First Amendment claims. 427 F.3d 1253, 1266 (10th Cir. 2005). The opposite is true here.

Defendants again stress that the restrictions on Mr. Pryor do not prevent him from speaking out on Facebook. As explained above, however, the restrictions are based on Mr. Pryor's Facebook posts, and the associated reasoning does not differentiate between protected and other speech. Consequently, that avenue of expression is not an adequate alternative for Mr. Pryor.

## C. The Balance of Harms[13]

The next consideration for issuing the preliminary injunction is whether the threatened injury to Mr. Pryor outweighs any injury Defendants face if the injunction is granted. Mr. Pryor asserts that "Defendants do not have an interest in enforcing the [Thompson Letter] because it is constitutionally infirm." Mot. at 8. Defendants counter that the restrictions themselves are not constitutionally infirm because they only limit Mr. Pryor's access to DPS property and do not directly restrict his speech. As I have found, however, the evidence in the record shows the restrictions resulted from Mr. Pryor exercising his free speech rights and so are likely constitutionally infirm.

Defendants claim that, if the requested injunction is issued, it "will enable Plaintiff to resume his abusive, threatening and harassing behavior, disrupting the tranquility of DPS schools and District facilities, and interfering with the ability of DPS to fulfill its educational mission and create a safe workplace for its employees." Resp. at 24. The restrictions imposed on Mr. Pryor do not prevent him from engaging in much of the complained of behavior, so lifting them would not

---

[13] Generally, when the government opposes a motion for a preliminary injunction, the harms to be balanced are the threatened injury to the movant versus any injury to the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). I analyze the balance of harms and public interest considerations separately here, though, as it is not clear in this case that Defendants' interest and the public interest are fully aligned.

be the cause of any continued objectionable conduct. Moreover, my findings do not endorse the full scope of the preliminary injunction requested by Mr. Pryor. His conduct not involving protected speech may form the basis for Defendants to place some restrictions on him. Similarly, where Defendants can show clear violations of DPS Policies and narrowly tailor the restrictions imposed, its decisions will not suffer from the same infirmities.

### D. The Public Interest

The final question is whether issuing the preliminary injunction is in the public interest. Mr. Pryor contends the preliminary injunction is in "the public interest because it will serve to protect a fundamental constitutional right." Mot. at 8. According to Mr. Pryor, this will restore public confidence in the ability to exercise First Amendment rights. In addition, Mr. Pryor emphasizes that he has particular knowledge and skills to impact youth positively and DPS students will suffer if the restrictions remain in place. Defendants, in turn, claim that "[a] preliminary injunction would be contrary to the public interest because it would undermine [their] reasonable efforts to preserve the tranquility of DPS and protect DPS staff members from bullying and harassment." Resp. at 24-25. Based on my analysis above, I find that the public interest will be served by granting a limited preliminary injunction. The injunction does not prevent Defendants from "protect[ing] DPS staff members from bullying and harassment;" it requires that First Amendment rights be given due consideration.

## IV.  CONCLUSION

Accordingly, I find that Mr. Pryor is likely to succeed on the merits of his First Amendment retaliation claim against Defendants Superintendent Marrero and Deputy Smith and that the balance tips in favor of issuing a limited preliminary injunction. Mr. Pryor's Motion for Preliminary Injunction (ECF No. 4) is, therefore, GRANTED IN PART and IT IS ORDERED:

- **Defendants Denver Public Schools, Superintendent Alex Marrero, and Deputy Superintendent Anthony Smith and Defendants' agents, servants, employees, and attorneys and all others who are in active concert or participation with Defendants are preliminarily ENJOINED from enforcing the terms of the letter written by DPS General Counsel Aaron Thompson dated October 18, 2022, and are further ENJOINED from taking any other retaliatory action against Mr. Pryor, his family, or the STEAM Academy for pursuing this lawsuit.**

- **This Preliminary Injunction shall take effect immediately and shall remain in effect pending trial in this action or further order of this Court.**

- **No bond under Federal Rule of Civil Procedure 65(c) is required.**

DATED this 23rd day of December, 2022.

_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE